SHAWN M. LOCKETT ET AL                    CIVIL ACTION

VERSUS                                    NO: 08-4712

NEW ORLEANS CITY ET AL                    SECTION: J(2)

## ORDER AND REASONS

Before the Court are the **Motion to Dismiss Pursuant to FRCP 12(b)(1) (Rec. Doc. 47)** filed by Piyush "Bobby" Jindal in his official capacity as Governor of Louisiana; Christopher Ahner, in his official capacity as Specialist in the Louisiana Air National Guard; Brandt Arceneaux, in his official capacity as Sergeant in the Louisiana Air National Guard; Jonathan Bieber, in his official capacity as Master Sergeant in the Louisiana Air National Guard; and Joseph Thomas, in his official capacity as a Southern University of New Orleans ("SUNO") campus police officer (collectively, "the State Defendants").  The National Guardsmen defendants will be referred to collectively as "the MP Defendants."  Also before the Court is the **Motion for Summary Judgment(Rec. Doc. 48)** filed by the State Defendants.  These motions seek dismissal of Plaintiffs' claims under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and various state causes of action arising from Shawn M. Lockett's arrest on July 1, 2008.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

On July 1, 2008, Lockett was driving from his home in New Orleans East to a class at SUNO scheduled for 9:10 a.m.  Bieber

and Arceneaux were conducting a patrol near SUNO as members of the National Guard Task Force ("NGTF" or "Task Force Gator") assisting the New Orleans Police Department ("NOPD") with post-Katrina law enforcement in the city under order of Governor Jindal. From here, the parties' descriptions of the events preceding Lockett's arrest become diametrically opposed.

Shortly after 9:00 a.m., Bieber and Arceneaux saw Lockett traveling west on Hayne Boulevard at a speed faster than the flow of traffic.[1] Bieber and Arceneaux then began to follow Lockett, and allegedly witnessed him disregard a red traffic light at the intersection of Hayne and Downman Road, as well as a stop sign at the intersection of Downman and Leon C. Simon. Additionally, Arceneaux estimated Lockett's speed in excess of 45 miles per

---

[1] There is much made in the parties' briefing regarding the conflicting evidence as to whether and by how much Lockett was exceeding the speed limit. The State Defendants assert in their memoranda that Bieber and Arceneaux paced Lockett - i.e. determined his speed relative to the speed of their own vehicle and without any electronic speed recording equipment - driving in excess of 45 m.p.h. Rec. Doc. 48-1, p. 2. However, Lockett's deposition indicates that Lieutenant Fletcher of the NOPD initially informed him that the MP Defendants had reported his speed at over 100 m.p.h. See Rec. Doc. 51-1, p. 65. Additionally, Mrs. Lockett's hand-written notes from the day of the arrest indicate that Fletcher and Ahner told her that Lockett had been traveling at 90 m.p.h. Rec. Doc. 51-10, p. 3. Fletcher's own testimony recounted that the MP Defendants reported that Lockett was going as fast as 90 m.p.h. and at least over 70 m.p.h. See Rec. Doc. 51-17, p. 45. Additionally, Lockett notes Bieber and Arceneaux's testimony that he was driving at 75 m.p.h. Rec. Doc. 51-3, p. 27; 51-4. p. 94. The Court acknowledges these discrepancies, but also notes that Lockett has not at any point denied that he was speeding.

hour.

Contrary to Arceneaux and Bieber's assertions, Lockett claims that he stopped at the red light on Hayne and Downman, then executed a right turn onto Downman after checking for traffic. Afterwards, Lockett alleges that he came to a complete stop at the stop sign on Downman and Leon C. Simon, yielded to a truck that had reached the intersection before him, then proceeded left on Leon C. Simon and over the Seabrook Bridge. Once on the bridge, Lockett noticed lights on a law enforcement vehicle and, once he realized he was being pulled over, he turned onto SUNO's North Campus into the driveway shared by SUNO and the FBI Academy. According to the NOPD incident recall report, Bieber and Arceneaux radioed the traffic stop in to dispatch at 9:13:32 a.m. Thus, according to the State defendants, at the time of the traffic stop, Lockett was already late for class, which corroborates the allegations by Bieber and Arceneaux that he was speeding.

Lockett alleges, with the support of Bieber and Arceneaux's deposition testimony, that the initial intention during the traffic stop was to issue a warning to Lockett for his alleged traffic violations. See Bieber's Deposition Testimony, Rec. Doc. 51-3, Exhibit C, p. 67; Arceneaux's deposition testimony, Rec. Doc. 51-4, Exhibit D, pp. 123-24. In fact, Lockett notes Arceneaux's testimony that Lockett's alleged violations may have

amounted to *careless* driving, not *reckless* driving.  Rec. Doc.
51-4 at p.103.

Regardless, Bieber approached Lockett's vehicle and began to
talk with Lockett.  Lockett alleges that Bieber approached in an
aggressive manner and asked him whether he knew how fast he had
been driving.  Lockett responded that he did not, but that he had
been going with the flow of traffic.  Bieber then allegedly asked
Lockett in "a very agitated tone" where he was going, to which
Lockett responded that he was going to class.  Bieber then
gestured toward the FBI building and asked Lockett how he would
like it if he (Bieber) went in to talk to his instructor,
apparently assuming that Lockett was a student at the FBI
Academy.  Lockett answered that he was going to class at SUNO,
and Bieber responded "in a hostile and derogatory manner" that
Lockett "**need**[ed] to go to SUNO."  Rec. Doc. 51 at p. 5 (emphasis
in original).  Lockett, believing that this statement was
"racially charged,"[2] asked Bieber what he meant by that

---

[2]  The following excerpt from Lockett's testimony more fully
explains his allegation that Bieber's statement was racially
charged:

> Q.   So he gestures toward the FBI building,  your
>      statement says that you said, "no, sir, I'm going
>      to class at SUNO, and then Bieber yells at you,
>      "you need to go to SUNO"?
> A.   Yes, Sir
> Q.   And you have in your statement the word "need" in
>      boldface. Why do you have the word  "need" in
>      boldface?
> A.   That's the word that hee emphasized.

Q.   Okay, and I realize this isn't going to be clear
     for the record, but just for my edification can
     you do it like he said it to you?
A.   Sure, "You need to go to SUNO."
Q.   All right. And then what did you say?
A.   "What exactly do you mean by that?"
Q.   When you say in your statement that you asked him
     what he meant by that statement and he yelled at
     you to get out of the vehicle, you don't put that
     in quotes, so what I'm asking you to tell me is
     exactly what did you say in response to him saying
     "you need to go to SUNO"?
A.   What do you mean by that?"
Q.   Okay. Did you yell -- did you raise your voice --
A.   No, sir.
Q.   -- at that point?
A.   No, sir.
Q.   What did you think he meant by it?
A.   It was clear that he was insinuating that SUNO was
     an institution that was not of standard learning
     but substandard learning for whatever particular
     reason that he felt that SUNO was an institution
     for substandard learning,
Q.   How do you extrapolate that meaning from "you need
     to go to SUNO"?
A.   It was clear that he was insinuating that SUNO was
     the place that I should be with him suggesting that
     I was an individual who did not have enough
     understanding to attend a university that was of a
     normal standard.
Q.   Were there any implications that you drew from his
     comment?
A.   From the comment?
Q.   The comment, "you need to go to SUNO," were there
     any other implications that you drew from that
     besides what you just told me?
A.   I was able to draw that SUNO being African-American
     university and him telling me that I need to go
     there as a substandard school that obviously he was
     insinuating that an African-American school was a
     substandard school.
Q.   Are you African-American?
A.   Yes, sir.
Q.   Are there any other races in your background that
     are -- are there any other races in your
     background?

statement, to which Bieber responded by ordering Lockett out of his vehicle and asking him to provide his license, registration, and proof of insurance. Bieber also frisked Lockett at this point.[3] For his part, Bieber contends that after he made the allegedly "racially charged" statement to Lockett, which elicited Lockett's question regarding the statement's meaning, Bieber stepped away from the vehicle and called his supervisor Ahner.

Bieber denies that he made this statement as Lockett alleges, and further denies that his statement had any racial implication whatsoever. Specifically, Bieber explained his statement as follows:

Q. What were the exact words?
A. That if he had left his house sooner, he would be at SUNO already for his chemistry lab. That way he wouldn't have been speeding through the district, and saying that you need to be at SUNO meant if he had left his house sooner, then he would have already been at SUNO and we wouldn't be in the present situation that we were in.
Q. Did you give him the full sentence that "if you left your house sooner and done this and did all

A. Yes, sir.
Q. Which are they?
A. Unique New Orleans mix. I would not be certain of everything.
Q. Creole; is that right?
A. Yes, sir.

Rec. Doc. 51-1, Exhibit A, Lockett's Deposition Testimony, pp. 22-24.

[3] While Lockett testified that Bieber frisked him at this point, Bieber's testimony indicates that only Arceneaux frisked him during the initial stages of the stop. Rec. Doc. 51-3, p. 37.

these other things, you would be there already" or
             you just simply said "you need to be at SUNO?"
    A.       Yes, sir. I gave him the full statement. The only
             thing that he's saying is just that I said "you
             need to be at SUNO" but I think that was omitted
             [sic] everything what [sic] I had said.

Rec. Doc. 51-3, p. 14.[4]

    In the meantime, Arceneaux approached Lockett's vehicle to
ask for his license, registration, and proof of insurance.  As it
turned out, Lockett's proof of insurance card was expired.
Lockett explained that he did in fact have car insurance, but had
simply forgotten to put his new proof of insurance card in his
vehicle.  Lockett also called his insurer as a means of proving
that he had insurance.[5]  After this, Locket dialed 911 on his
cell phone to request the presence of NOPD officers due to the
alleged harassment and racial comments by Bieber.[6]  During this

---

    [4] Arceneaux, who was also initially on the scene and
overheard Bieber's conversation with Lockett, corroborates
Bieber's contention that he did not simply say "you need to be at
SUNO," but rather said something to the effect of "you need to be
at SUNO" or "you need to be going to SUNO" with the intended
meaning that if Lockett were actually at SUNO at the time of the
stop, he would not have been late and would not have need to
speed.  Rec. Doc. 51-4, p.83.

    [5] Lockett testified at deposition that he called GEICO, his
insurer, and offered to have the operator speak with Bieber
regarding his coverage.  Bieber indicated that the information
should be faxed.  Ultimately, the information was not faxed and
Lockett hung up with GEICO prior to calling 911.  Incidentally,
Lockett testified that the GEICO operator herself noted Bieber's
allegedly angry tone in the background of her conversation with
Lockett.  Rec. Doc. 51-1, pp. 29-32.

    [6] According to the State Defendants, the 911 call record
indicates that Lockett's 911 call was made at 9:13 a.m.  However,

call, Arceneaux approached and continued to ask Lockett for proof
of insurance, and Lockett told Arceneaux he did not have it but
that he (Arceneaux) could call the insurer.  After the 911 call,
Lockett called his wife Melanie Lockett, who is also a plaintiff
in this case, to request her presence due to the escalating
situation.[7]  After these calls, Arceneaux performed a second
search/frisk of Lockett, and directed Lockett to return to his
vehicle.

At this point, as a result of Lockett's involvement of the
NOPD, Arceneaux and Bieber radioed for their supervisor, Ahner.
Ahner asked if Bieber's safety was in any danger, and Bieber
responded that he was fine and had the situation under control.
However, Bieber again requested Ahner's presence at the scene.
In turn, Ahner requested the presence of Lieutenant Lynn
Fletcher, an NOPD supervisor.

---

Lockett testified at deposition that he did not call 911 for
approximately ten to fifteen minutes after he was pulled over.
This time frame described by Lockett would be impossible if he
were pulled over at 9:13 (as NOPD's radio records indicate) and
also made his 911 call at 9:13 (as the 911 call record
indicates).  The import of this timing discrepancy concerns
whether and to what extent Bieber's comments created or could
have been interpreted to create a racially hostile environment,
and whether Bieber's calling in of the traffic stop was in
response to Lockett's comments regarding racial discrimination in
his 911 call.

[7]  Melanie Locket is an associate attorney at the law firm
of Lowe, Stein, Hoffman, Allweiss, & Hauver, L.L.P., which
represents Plaintiffs in this case.  However, contrary to the
assertions of the State Defendants, Mrs. Lockett is not
representing Mr. Lockett or herself in the present matter.

In response to Lockett's and Ahner's calls, NOPD dispatched Lieutenant Fletcher, and Officers Tocka Clark and Reginald Gains to the scene. In the interim, Thomas had arrived at the scene in the course of his patrol as a SUNO police officer. Lockett informed him of the situation, and indicated that he was being treated in a hostile and racist manner, and had been detained for an unknown reason. Arceneaux then informed Thomas that Lockett had been stopped for speeding and running a red light and stop sign. Thomas remained on the scene to direct passing traffic around the stopped vehicles.

Soon thereafter, Ahner arrived on the scene and was advised by Arceneaux that Lockett had been speeding, had run a red light and stop sign, and had been uncooperative regarding the proof of insurance. Ahner then asked Locket to step out of his vehicle, frisked Lockett a third time, and handcuffed him. At this point, Lockett was read his Miranda rights and placed in the military police vehicle. Mrs. Lockett arrived as her husband was being put into the military police vehicle, and introduced herself as his wife and attorney. However, she claims that she was not allowed to speak with her husband.

Lockett alleges that he asked if he was under arrest as he was being put into the vehicle, and that Ahner responded that he was not, but asked if he wanted to be. While in the car, Lockett alleges that he was questioned by Ahner and Fletcher, who both

informed him that they were trying to determine whether to arrest him or give him a ticket. Fletcher told Lockett that Bieber and Arceneaux claimed he had been driving over 100 miles per hour, which Lockett denied by noting that his vehicle has an electronic mechanism that prevents driving at such speeds. Ahner and Fletcher then told Mrs. Lockett that her husband had been driving at 90 miles per hour.[8] At some point, Lockett was allowed to get out of the car to stretch, had his handcuffs readjusted, and was re-mirandized. Throughout this process, Lockett alleges that Ahner continuously insisted that he was in charge. Likewise, Lockett contends that Ahner and Fletcher talked together apart from him, and also notes that Mrs. Lockett had various discussions with Ahner, Fletcher, Thomas, and Clark. Eventually, Lockett was moved from the MP police car, patted down by Gains, and placed in the NOPD police car. Lockett alleges that as the NOPD car pulled off, Ahner repeatedly made statements indicating that he was in charge, and asking Lockett to affirmatively state that he (Ahner) was in charge.

---

[8] As for Lockett's speed prior to the traffic stop, Lockett points out that the various officers' estimation of his speed prior to being pulled over have conflicted since the beginning of this case, and have continued to change. See note 1 above. Fletcher testified that a reckless driving offense occurs if a driver operates a vehicle 15-20 miles per hour over the speed limit, or if he commits multiple violations or endangers another person by his operation. Rec. Doc. 51-17, p.45. Lockett suggests that the changing rate of speed suggested at various times by the State Defendants indicates an attempt to improperly justify his arrest for reckless operation.

In the end, Lockett was arrested by the NOPD and processed for reckless operation of his vehicle in violation of New Orleans Code of Ordinances 154-382 and cited for the same offense. Eventually, Lockett pled guilty to a non-moving violation and paid a fine. Shortly after his release on the day of the arrest, Lockett and his wife filed a complaint with Captain Douget at the military police headquarters based on allegations of excessive use of force during the arrest that resulted in alleged injuries to Lockett's wrists. The State Defendants note that Lockett did not seek any medical treatment for these alleged injuries until seven days after the arrest.

Lockett and his wife filed the present suit, naming the following defendants:

(1) City of New Orleans;
(2) Piyush "Bobby" Jindal ("Jindal"), in his official capacity as Governor of Louisiana;
(3) Mayor Clarence Ray Nagin ("Nagin"), in his official capacity as Mayor of New Orleans;
(4) Superintendent Warren Riley ("Riley"), in his official capacity as Superintendent of the New Orleans Police Department;
(5) Ahner, individually and in his official capacity as Master Sergeant in the Louisiana Air National Guard;
(6) Bieber, individually and in his official capacity as a member of the Louisiana National Guard;
(7) Arceneaux, individually and in his official capacity as a member of the Louisiana National Guard;
(8) Fletcher, individually and in his official capacity as a Lieutenant in the New Orleans Police Department;
(9) Gains, individually and in his official capacity as a New Orleans police officer;
(10) Tocka Clark, individually and in her official capacity as a New Orleans police officer; and
(11) Thomas, individually and in his official capacity as a SUNO campus police officer.

Lockett asserts claims under 42 U.S.C. §§ 1981, 1983, 1985(3), 1986, and 1988, along with supplemental state law claims for assault and battery, false arrest, false imprisonment, malicious abuse of power, intentional infliction of emotional distress, loss of reputation, emotional distress, humiliation, embarrassment, pain and suffering, and negligence.  Mrs. Lockett asserts claims for intentional infliction of emotional distress under Article 2315.6 of the Louisiana Civil Code against Bieber, Arceneaux, Ahner, Fletcher, Gains, Clark, and Thomas.  Finally, Plaintiffs also seek injunctive relief against Governor Jindal, Mayor Nagin and Superintendent Riley in the form of a prospective prohibition against racial discrimination and/or profiling, and unlawful searches and seizures by National Guard Military Police against civilians.

**THE PARTIES' ARGUMENTS AND DISCUSSION**

**I.    State Defendants' Motion under Rule 12(b)(1)**

**A.    The Parties' Arguments**

The State Defendants, in their official capacities, argue for dismissal of the Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  The State Defendants argue that Eleventh Amendment sovereign immunity bars any action by a citizen in federal court against a state or any instrumentality of the state for injunctive, declaratory, or monetary relief, as well as any

action for monetary relief against state officials sued in their official capacity. <u>Rodriguez v. Texas Comm'n on the Arts</u>, 199 F.3d 279 (5th Cir. 2000). Further, although Eleventh Amendment immunity is not a jurisdictional bar in and of itself, it does grant a state the power to assert the immunity defense on its own discretion. <u>Wis. Dept. Of Corrections v. Schacht</u>, 524 U.S. 381 (1998). As such, and to the extent that Plaintiffs' claims proceed against the State Defendants in their official capacities, the Eleventh Amendment bars the prosecution of the present suit.

In opposition, Plaintiffs argue that under the doctrine of <u>Ex Parte Young</u>, suits for prospective injunctive relief against state officials to protect against violations of federal law are not barred by the Eleventh Amendment. <u>Verizon Md., Inc. v. Public Service Comm'n of Maryland</u>, 535 U.S. 635 (2002). Plaintiffs argue that to determine whether the Eleventh Amendment bars a claim for injunctive relief, a court must "conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." <u>Id</u>. Thus, Plaintiffs argue that their claim against Governor Jindal for prospective injunctive relief to prevent civil rights violations by the Louisiana National Guard is not barred by the Eleventh Amendment. Furthermore, Plaintiffs argue that the State Defendants' actions

in filing a motion for protective order, a motion to compel, and a motion for summary judgment all amount to a constructive waiver of their sovereign immunity. See <u>Lapides v. Bd. of Regents of Univ. Sys. of Ga.</u>, 535 U.S. 613 (2002).

In reply, the State Defendants argue that Plaintiffs' claims for injunctive relief are moot given that the Louisiana National Guard's mission in New Orleans ended by order of the Governor on February 28, 2009. Additionally, the State Defendants argue that their conduct in this litigation does not rise to the level of waiver of immunity in federal court, as they have not exhibited any affirmative intent to waive that immunity. See <u>Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd</u>, 527 U.S. 627, 675-76 (1999) ("Generally, we will find waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to our jurisdiction.").

Plaintiffs respond that their claims for injunctive relief are not moot, as the Governor retains the ongoing authority to install the National Guard in support of local law enforcement in the future. Additionally, Plaintiffs argue that the State Defendants' conduct in this litigation does constitute waiver under the doctrine of <u>Lapides</u>, which has been recognized by the Fifth Circuit in <u>Fairley v. Stalder</u>, 294 Fed. Appx. 805 (5th Cir. 2008).

**B.   Discussion**

As an initial matter, the Court notes that  "[b]ecause sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice." Warnock v. Pecos County, Tex ., 88 F.3d 341, 343 (5th Cir. 1996).

The law of Eleventh Amendment sovereign immunity proceeds from the Constitution and considerations of federalism to bar all individuals from suing a State for money damages in federal court. Frew ex rel. Frew v. Hawkins, 540 U.S. 432, 437 (2004); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996); Ussrey v. Louisiana, 150 F.3d 431, 434 (5th Cir. 1998).  Likewise, "the Eleventh Amendment by its terms clearly applies to a suit seeking an injunction, a remedy available only from equity."  Early v. So. Univ. & Agr. & Mech. Coll. Bd. of Sup'rs, 252 Fed. Appx. 698, 700 (5th Cir. 2007) (quoting Cory v. White, 457 U.S. 85, 91 (1982)).  However, "the Eleventh Amendment does not bar claims for prospective relief against state officials acting in their official capacity." See Edelman v. Jordan, 415 U.S. 651, 664 (1974); Ex Parte Young, 209 U.S. 123, 155-56 (1908); Nelson v. Univ. of Tex. at Dallas, 535 F.3d 318, 321-22 (5th Cir.2008). Nonetheless, to "satisfy the threshold requirement imposed by Art. III of the Constitution," a plaintiff seeking injunctive relief must "show that he 'has sustained or is immediately in

danger of sustaining some direct injury' as the result of the challenged . . . conduct." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 109 (1983) (citations omitted). As such, "[t]o pursue an injunction or a declaratory judgment, the [plaintiffs] must allege a likelihood of future violations of their rights by [the defendant], not simply future effects from past violations." <u>Armstrong v. Turner Industries, Inc.</u>, 141 F.3d 554, 563 (5th Cir. 1998) (citing <u>Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.</u>, 28 F.3d 1268, 1273 (D.C. Cir. 1994). Thus, when a plaintiff "allege[s] only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future," he does not have standing to seek the prospective relief allowed under the <u>Ex Parte Young</u> doctrine. <u>Armstrong</u>, 141 F.3d at 563; see also <u>Davis v. Tarrant County, Tex.</u>, --- F.3d ----, 2009 WL 931169, *11 (5th Cir. Apr. 8, 2009).

State officials may invoke Eleventh Amendment sovereign immunity when they are sued in their official capacities. <u>Edelman v. Jordan</u>, 415 U .S. 651, 663 (1974). Congress may, however, abrogate a State's sovereign immunity under Section 5 of the Fourteenth Amendment if congressional intent to abrogate is expressed unequivocally and Congress has acted pursuant to a valid exercise of its power. <u>Ussrey</u>, 150 F.3d at 434.

Congress has not abrogated the states' sovereign immunity

16

for claims arising under 42 U.S.C. § 1983. <u>Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Colony</u>, 538 U.S. 701, 709 (2003); <u>Champagne v. Jefferson Parish Sheriff's Office</u>, 188 F.3d 312, 314 (5th Cir.1999) (per curiam).  Additionally, Congress has not abrogated the states' sovereign immunity under §§1981, 1985, or 1986.  See, e.g., <u>Early</u>, 252 Fed. Appx. at 700; <u>Baxter v. Louisiana</u>, 2003 WL 22175990, *1 (E.D. La. Sept. 19, 2003). Furthermore, the State of Louisiana has not waived its sovereign immunity from § 1983 actions brought against them in federal court.  <u>Kervin v. City of New Orleans</u>, 2006 WL 284986, *2 (E.D. La. Sept. 28, 2006) (citing La. Rev. Stat. Ann. § 13:5106(A) (Supp.2006) ("No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.")).  Nor has the State of Louisiana waived it sovereign immunity from claims under §§ 1981, 1985, or 1986.  See, e.g., <u>Grier v. Louisiana</u>,  2004 WL 1638120, *1 (E.D. La. July 22, 2004) (§1981); <u>Baxter</u>, 2003 WL 22175990 at *1 (§§1985 & 1986).

In addition, a State may *constructively* waive its sovereign immunity by its litigation conduct. <u>Id</u>.  In determining whether a state has waived its sovereign immunity, the Fifth Circuit applies a limited inquiry, under Supreme Court precedent, regarding

> whether the state (1) expressly consented to suit in
> federal court, see <u>Atascadero State Hosp. v. Scanlon</u>, 473

17

U.S. 234 (1985), superseded by statute on other grounds
as stated in <u>Pace v. Bogalusa City Sch. Bd.</u>, 403 F.3d
272, 280 n. 29 (5th Cir.2005) (en banc), or (2) waived
its sovereign immunity through litigation conduct, for
example, by voluntarily invoking a federal court's
subject matter jurisdiction, see <u>Lapides v. Bd. of
Regents of Univ. Sys. of Ga.</u>, 535 U.S. 613, 619, 122
(2002).

<u>Sossamon v. Lone Star State of Texas</u>, 560 F.3d 316, 330 n.38 (5th

Cir. 2009). The Supreme Court has held that waiver requires "an

unequivocal indication that the State intends to consent to

federal jurisdiction that otherwise would be barred by the

Eleventh Amendment" based on the fact that "constructive consent

is not a doctrine commonly associated with the surrender of

constitutional rights." <u>Atascadero State Hosp. v. Scanlon</u>, 473

U.S. 234, 238 n. 1 (1985). Likewise, the Fifth Circuit has

applied the general rule that a State's waiver of Eleventh

Amendment immunity must be unequivocal, if not express. See,

e.g., <u>Perez v. Region 20 Educ. Serv. Ctr.</u>, 307 F.3d 318, 332

(5th Cir.2002); <u>Neinast v. Texas</u>, 217 F.3d 275, 279 (5th Cir.

2000). In this context, the Fifth Circuit has held, under the

Supreme Court's decision in <u>Lapides</u>, that a State's voluntary

action in removing a case from state to federal court constitutes

an unequivocal waiver of Eleventh Amendment immunity. <u>Meyers ex

rel. Benzing v. Texas</u>, 410 F.3d 236, 255 (5th Cir. 2005).

However, the Fifth Circuit has restricted the application of

litigation-conduct waiver as described in <u>Lapides</u> to cases in

which a state voluntarily invokes the jurisdiction of the federal

18

court by removing a case from state court. See Id. at 242-43;

see also, e.g., Spooner v. Jackson, 251 Fed. Appx. 919, 924 (5th

Cir. 2007). In instances other than removal, the Fifth Circuit

has not found "that [a state's] litigation conduct created

'inconsistency, anomaly, and unfairness' to a degree that

requires waiver of sovereign immunity" as described in Lapides.

In re Katrina Canal Breaches Litigation, 309 Fed. Appx. 833, 835

(5th Cir. 2009) (citing Fairley v. Stalder, 294 Fed. Appx. 805,

810 (5th Cir.2008) and Lapides, 535 U.S. 613, 620 (2002))

(refusing to find litigation-conduct waiver in Katrina-related

litigation against the state of Louisiana simply because the

state had previously brought other non-related law suits in

federal court); Sossamon, 560 F.3d at 330 n.38 (refusing to find

litigation conduct waiver in suit under Religious Land Use and

Institutionalized Persons Act merely because State of Texas

requested attorney's fees in its answer). In the end, a

determination of whether a state has waived its Eleventh

Amendment immunity "must focus on the litigation act the State

takes that creates the waiver" and whether that act *clearly*

indicates an intent to waive. Lapides, 535 U.S. at 620.

Eleventh Amendment immunity "extends to any state agency or

entity deemed an 'alter ego' or 'arm' of the state." Perez v.

Region 20 Educ. Serv. Ctr., 307 F.3d 318, 336 (5th Cir. 2002).

Whether an entity is covered by a State's Eleventh Amendment

immunity turns on the entity's (1) status under state statutes and case law, (2) funding, (3) local autonomy, (4) concern with local or statewide problems, (5) ability to sue in its own name, and (6) right to hold and use property. See, e.g., <u>Hudson v. City of New Orleans</u>, 174 F.3d 677, 681 (5th Cir.1999); <u>Champagne v. Jefferson Parish Sheriff's Office</u>, 188 F.3d 312, 313 (5th Cir.1999). Funding is most important. <u>Id</u>. at 681-82. These factors suggest that all Louisiana executive departments have Eleventh Amendment immunity. <u>Champagne</u>, 188 F.3d at 313; <u>Darlak v. Bobear</u>, 814 F.2d 1055, 1060 n. 5 (5th Cir.1987).

In this case, it is clear that the claims against Governor Jindal in his official capacity are barred by the Eleventh Amendment: "The Court cannot entertain jurisdiction over the Governor of the State of Louisiana in [his] official capacity . . . as [he is] protected from suit by the doctrine of sovereign immunity as found in the Eleventh Amendment of the Constitution." <u>Berthelot v. Boh Brothers Const. Co., L.L.C.</u>, 2006 WL 2256995, *14 (E.D. La. July 19, 2006).

Likewise, the claims against Ahner, Arceneaux, and Bieber in their official capacities as members of the Louisiana Air National Guard are also barred by the Eleventh Amendment. The Louisiana Constitution provides that "[t]he governor shall be commander-in-chief of the armed forces of the state, except when they are called into service of the federal government." La.

Const. art. 4, §5(J). Thus, the Louisiana Air National Guard is an executive department of the state of Louisiana, and therefore is an arm of the state entitled to Eleventh Amendment immunity. See, e.g., <u>Bryant v. Military Dept. of State of Miss.</u>,381 F. Supp.2d 586, 591 n.6 (S.D. Miss. 2005) ("In each state the National Guard is a state agency, under state authority and control.")[9] (quoting <u>Knutson v. Wisconsin Air Nat. Guard</u>, 995 F.2d 765, 767 (7th Cir. 1993)).

Finally, Thomas is entitled to Eleventh Amendment immunity for the claims against him in his official capacity as a SUNO police officer. The Fifth Circuit has held that SUNO is a state agency entitled to Eleventh Amendment immunity. <u>Richardson v. S. Univ</u>., 118 F.3d 450, 454-56 (5th Cir.1997).[10] Thus, to the

---

[9] The Court has not located any Fifth Circuit cases directly addressing whether the Louisiana Air National Guard is entitled to Eleventh Amendment immunity. However, the <u>Bryant</u> case, although it involves employment law claims against the Mississippi Air National Guard, is analogous and persuasive authority. The <u>Bryant</u> court noted that "[b]ecause of the hybrid nature of the Guard, questions may arise as to whether the actions of the Guard and/or individual defendants were under color of state or federal law." 381 F. Supp 2d at 591 n.6. However, the court further noted that "the parties appear to agree, and the facts substantiate that [the Mississippi Air National Guard] is a state agency as to the matters at issue." <u>Id</u>. Likewise, the parties in this matter appear to agree that Ahner, Arceneaux, and Bieber were acting in their official capacity as members of the Louisiana Air National Guard, which was in turn acting under color of state law.

[10] The Court also notes that, in their opposition to the State Defendants' motion for summary judgment, Plaintiffs concede that Thomas is a "state police officer." Rec. Doc. 51, p.29.

extent Plaintiffs assert federal claims against Thomas acting in his official capacity as a SUNO police officer, those claims are barred by the Eleventh Amendment. See <u>Early v. S. Univ. & Agr. & Mech. Coll. Bd. of Sup'rs</u>, 252 Fed. Appx. 698, 700-701(5th Cir. 2007).[11]

Additionally, the Court finds that the State Defendants have not clearly exhibited an intent to waive their Eleventh Amendment immunity by their litigation conduct in this matter. First of all, this suit was originally brought before this Court by Plaintiffs, and was not removed to the federal forum by the State Defendants. Thus, the Fifth Circuit's narrow application of <u>Lapides</u> in the context of waiver by removal is inapplicable.

Furthermore, even if litigation conduct other than removal were sufficient to exhibit a clear intent to waive Eleventh Amendment immunity, the State Defendants participation in this litigation did not indicate such intent. First, although the

---

[11] Although this issue was not raised by the parties, the Court also notes that according to "long and clearly established Supreme Court precedent . . . neither a State nor its officials acting in their official capacities are 'persons' under § 1983," and thus neither a State nor its officials are amenable to suit under §§1983, 1985, or 1986. <u>Fairley v. Stalder</u>, 294 Fed. Appx. 805, 808-809 (5th Cir. 2008); <u>Bryant v. Military Dept. of State of Miss.</u>,381 F. Supp. 2d 586, 592 (S.D. Miss. Aug. 26, 2005) (holding that "claims under §§ 1983, 1985 and 1986 are barred for the further reason that these statutes create rights solely against 'persons' and a state is not considered a 'person' under these statutes"). Thus, Plaintiffs' official capacity claims under §§1983, 1985, and 1986 fail for this reason as well as for the reasons discussed above.

State Defendants do not explicitly refer to Eleventh Amendment immunity in their answer, they do claim the affirmative defense of absolute immunity. Rec. Doc. 14, at p.2. While this may not be a clear invocation of Eleventh Amendment immunity, it is by no means a clear waiver of that immunity. Furthermore, although Plaintiffs cite the fact that the State Defendants filed a motion for protective order, motion to compel, and motion for summary judgment, this limited participation in the present suit does not rise to the level of waiver by litigation conduct as contemplated by Lapides and the Fifth Circuit's application of that case. See Sossamon v. Lone Star State of Texas, 560 F.3d 316, 330 n.38 (5th Cir. 2009) (finding no waiver of Eleventh Amendment immunity despite state defendant's request for attorney's fees in answer). Additionally, the Court notes that while the State Defendants have filed a motion for summary judgment, that motion was preceded by the present motion to dismiss on Eleventh Amendment grounds. In the end, the State Defendants' conduct in the current case does not indicate a clear intent to waive the immunity defense under the Eleventh Amendment by invoking the federal jurisdiction of this Court.

Finally, Plaintiffs' claims for prospective injunctive relief against Governor Jindal under the Ex Parte Young doctrine also fail, as Plaintiffs have not shown any likelihood of similar violations by the State Defendants in the future. In fact, the

Louisiana National Guard's law enforcement presence in New

Orleans as part of the NGTF was terminated as of March 1, 2009.[12]

Accordingly, Plaintiffs have not and cannot "allege a likelihood

of future violations of their rights by [the defendant], not

simply future effects from past violations." Armstrong v. Turner

Industries, Inc., 141 F.3d 554, 563 (5th Cir. 1998). As such,

Plaintiffs claims for prospective injunctive relief against the

State Defendants fail as a matter of law.

## II. State Defendants' Motion for Summary Judgment

### A. The Parties' Arguments[13]

#### (1) State Defendants Arguments in Support

The State Defendants have also moved for summary judgment on

qualified immunity grounds as to *all federal claims* against them

in their *individual* capacities.

As for Lockett's §1983 tort claims, the State Defendants

argue that they are entitled to qualified immunity based on the

fact that the MP Defendants had probable cause to arrest Lockett

for traffic violations. The State Defendants note that evidence

---

[12] See Donna Miles, *Guard Ends New Orleans Mission, Focuses on Wildfires, Snow,* Mar. 2, 2009, available at http://www.ngb.army.mil/news/archives/2009/03/030309-Guard.aspx.

[13] The State Defendants argue for dismissal of Plaintiff's claims under 42 U.S.C. § 1981 on various legal grounds. However, Plaintiffs concede in their opposition that they have not and cannot state a claim for relief under § 1981, and thus consent to the summary dismissal of their claim under that section.

of an officer's subjective intent is irrelevant to a qualified
immunity defense; the only proper inquiry is whether the official
violated clearly established statutory or constitutional rights
which a reasonable person would have known.  Conn. v. Gabbert,
526 U.S. 286 (1999); Crawford-El v. Britton, 523 U.S. 574, 588
(1998).  In this situation, the State Defendants argue that the
MP Defendants had reasonable suspicion that a traffic offense had
been committed sufficient to justify their stop of Lockett's
vehicle.  Likewise, the State Defendants argue that the MP
Defendants developed probable cause to arrest Lockett as a result
of those violations and the circumstances of the stop.  The State
Defendants note that "[t]he determination of reasonable grounds
for an investigatory stop, or probable cause for arrest, does not
rest on the officer's subjective beliefs or attitude, but turns
on a completely objective evaluation of *all* the circumstances
known to the officer at the time of the challenged action." State
v. Landry, 729 So. 2d 1019 (La. 1999).  Further, the State
Defendants point out that qualified immunity in the context of
false arrest and unreasonable seizure claims can only be lost if
there is "not even 'arguably' . . . probable cause for the
arrest."  Hart v. O'Brien, 127 F.3d 424, 444 (5th Cir. 1997).  In
sum, because Bieber and Arceneaux witnessed Lockett speeding as
well as running a stop sign and red light, the State Defendants
argue that there was probable cause to both stop and arrest

Lockett for reckless operation – for which he was in fact arrested and eventually cited by NOPD – in violation of New Orleans Code of Ordinances §154-382.[14]  Thus, based on their objectively reasonable suspicion and probable cause belief that a traffic offense had occurred, the State Defendants' are entitled to qualified immunity.

With specific reference to Lockett's § 1983 false arrest claims, the State Defendants argue that the MP Defendants had probable cause – that is "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that [Lockett] had committed or was committing an offense" – to support an arrest for reckless operation.  <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).  Further, the State Defendants argue that even if Lockett's self-serving statements denying any traffic violations are taken at face value, this *still* does not vitiate a finding that the MP Defendants had sufficient probable cause based on their observations of Lockett's driving to support the arrest. In the end, the probable cause inquiry hinges not on whether the charges are defensible, but rather on whether the arresting officers had probable cause.  See <u>Baker v. McCollan</u>, 443 U.S. 137, 145 (1979).

---

[14]  "Reckless operation" is defined in the New Orleans Code of Ordinances as "the operation of any motor vehicle . . . in a criminally negligent or reckless manner."  New Orleans, La., Code of Ordinances §154-382.

As for Lockett's excessive force claims under § 1983, the State Defendants argue that their conduct in arresting and restraining Lockett was objectively reasonable in the circumstances. The State Defendants emphasize that the only use of force involved in this case was handcuffing, and further note that Ahner's affidavit indicates that he placed his little finger between the handcuff and Lockett's wrist to ensure they were not placed too tightly. As such, the State Defendants argue that they are entitled to qualified immunity on the excessive force claims.

The State Defendants also argue that Lockett's unreasonable search and seizure claims under § 1983 fail as a result of their qualified immunity defense. Specifically, because there was probable cause to arrest Lockett, the various searches of Lockett's person were justified. See Rawlings v. Kentucky, 448 U.S. 98 (1980) (noting that formal arrest does is not necessarily a temporal prerequisite to a search incident to arrest, as long as probable cause exists).

The MP Defendants also argue that Lockett's § 1985(3) claims of conspiracy to interfere with his civil rights fail as a matter of law.[15] As an initial matter, the MP Defendants argue that

_____

[15] As a clarification, Lockett only asserts claims under § 1985(3) against Ahner, Arceneaux, Bieber, and Fletcher, but not against the African-American NOPD officers – Thomas, Gains, and Clark – who were also involved in Lockett's arrest. See Compl. ¶LX

since they and Fletcher (one of the NOPD officers who effected Lockett's arrest) are all members of the same governmental entity, "[u]nder the intracorporate conspiracy doctrine, alleged concerted action by employees or officials of the same entity or organization cannot constitute a conspiracy for purposes of §1985." Hilliard v. Ferguson, 30 F.2d 649, 653 (5th Cir. 1994). As such, because the MP Defendants and Fletcher were effectively operating as members of the NOPD by their assignment through Task Force Gator/NGTF, Lockett's conspiracy claims necessarily fail under the intracorporate conspiracy doctrine. Likewise, the MP Defendants argue that Lockett's §1985 claims fail because they have not made a showing of any racial animus, a required element of the §1985 action. The MP Defendants argue that Lockett's internalized reaction to Bieber's alleged statement that he "needed to go to SUNO" simply does not support a finding of racial animus. Furthermore, even if Bieber's statement was intentionally racist, the MP Defendants argue that there is *no evidence* Arceneaux, Ahner, and Fletcher also harbored racial animus towards Lockett, and consequently there can be no § 1985 conspiracy.

As a result of the failure of Lockett's § 1985 claims, the MP defendants argue that his claims under § 1986 are also untenable. See Rodes v. Mabus, 676 F. Supp. 755 (S.D. Miss. 1987). Furthermore, as for the § 1986 claim asserted against

Thomas, the State Defendants point out that the Lockett *did not include a § 1985 claim against Thomas*, and thus cannot assert a § 1986 claim against him.

In addition to their qualified immunity grounds for dismissal of Plaintiffs' state law pendent claims, the State Defendants also invoke several state-law statutory immunities as a basis for summary judgment. First, the State Defendants cite Louisiana Revised Statutes §9:2798.1, which affords employees and officials of public entities with immunity from tort suits for discretionary acts. In addition, with respect to Lockett's claims of excessive force under § 1983, the State Defendants cite the Fifth Circuit's decision in <u>Glenn v. City of Tyler</u>, which held that handcuffing too tightly, without more, does not amount to excessive force. 242 F.3d 307 (5th Cir. 2001).

Additionally, the MP Defendants cite Louisiana Revised Statutes § 29:23, which allegedly immunizes national guardsmen from suit for any claims against guardsmen arising during their active service for the State of Louisiana. Likewise, the MP Defendants assert immunity under Louisiana Revised Statutes § 29:735(a)(1), which immunizes state agents from suit, except in the case of willful misconduct, for injuries resulting from their activities involving "homeland security and emergency preparedness." Under these statutes, the MP Defendants argue that the claims against them are barred by guardsmen immunity

under §29:23, and Thomas argues that the claims against him are barred by §9:2798.1.

Finally, as for Melanie Lockett's claims against the MP Defendants, the NOPD officers, and Thomas for bystander damages resulting from intentional infliction of emotional distress under Louisiana Civil Code Article 2315.6, the MP Defendants and Thomas argue simply that the claims are unavailing as a matter of fact. Specifically, the MP Defendants and Thomas argue that Melanie Lockett's witnessing of Lockett's arrest, even if it were a false arrest and unreasonably long period of detention, does not give rise to a claim under Article 2315.6. <u>Irvin v. Foti</u>, 1999 WL 504916 (E.D. La. 1999). Simply put, witnessing her husband being detained was not a sufficiently traumatic event to give Melanie Lockett a claim under Article 2315.6.

### (2) Plaintiffs' Arguments in Opposition

In opposition, Lockett argues that the State Defendants are not entitled to qualified immunity with respect to his § 1983 causes of action. Lockett contends that the alleged probable cause on which the State Defendants rely for their qualified immunity defense was merely a post-hoc fabrication to justify his treatment at their hands. Specifically, Lockett argues that the offense of "reckless operation" includes two elements: (1) operation of a vehicle **and** (2) criminal negligence. <u>State v. Redfearn</u>, 504 So. 2d 1005 (La. App. 1 Cir. 1987). "Criminal

negligence" is defined as "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." Id. Lockett argues that none of the State Defendants' incident reports reference *any type of endangerment* with respect to his driving. Additionally, Lockett notes that the various defendants' accounts of his speed have continuously changed throughout the course of this litigation, which suggests post facto justification for the arrest. Furthermore, Lockett argues that he was initially only informed of an alleged *speeding* violation, with the additional alleged violations mentioned only after his 911 call regarding racial discrimination. In any event, Lockett argues that questions of material fact remain with respect to the issue of probable cause and whether the State Defendants, amongst others, concocted additional charges over the course of his arrest.

In addition, even if the State Defendants did witness Lockett commit the alleged offenses, Lockett argues that the testimony of Arceneaux and Bieber defeats any claim that there was probable cause to make an arrest. In fact, Arceneaux and Bieber both admitted in their depositions that they only intended to *warn* Lockett about his alleged traffic violations at the commencement of the traffic stop. Bieber's deposition testimony, Rec. Doc. 51-3, Exhibit C to Pls.' Opp., p. 67; Arceneaux's

deposition testimony, Rec. Doc. 51-4, Exhibit D, pp. 123-24.  As

such, Lockett contends that there was no immediate decision to

arrest.  Additionally, Lockett notes that Arceneaux even

testified that Lockett's driving amounted merely to *careless*, but

not *reckless* driving.  Ex. D. at pp. 103-112.[16]  In this context,

Lockett points out that an officer only has the power to arrest

when "[t]he person to be arrested has committed an offense in his

presence; and if the arrest is for a misdemeanor, *it must be made

immediately or on close pursuit*."  La Code Crim. Proc. art. 213.

Thus, because Lockett's arrest occurred only after his 911 call

regarding alleged racial discrimination, he contends that, by

their own admission, Arceneaux and Bieber did not have probable

cause, and thus the State Defendants' qualified immunity defense

fails.  Finally, even if the State Defendants did witness the

alleged traffic violations, Lockett contends that none of them

alleged that he disregarded others and/or grossly deviated from

---

[16] The Court notes that in addition to prohibiting "reckless
driving," the New Orleans Code of Ordinances also prohibits
"careless driving," which is defined as the operation of "any
vehicle upon a highway . . . carelessly, and in disregard to the
rights and safety of themselves or others . . . ."  New Orleans,
La., Code of Ordinances §154-383.  The Court likewise notes that
Louisiana courts have held that "careless operation," as defined
under the Louisiana Revised Statutes - which definition is
referenced by the New Orleans Code of Ordinances - constitutes an
arrestable offense.  <u>State v. Short</u>, 839 So.2d 173 (La. App. 4
Cir. 2003) ("It is undisputed that the officers saw the defendant
commit a traffic offense. At that point, they had probable cause
to stop him for the commission of that offense. See <u>State v.
Wilson</u>, 467 So.2d 503, 515 (La.1985); <u>State v. Diaz</u>, 2001-0523
(La. App. 4 Cir. 10/31/01), 800 So.2d 1090. ).").

the standard of care of an ordinary driver. Thus, Lockett argues that there was no probable cause for a "reckless driving" arrest, and in the very least asserts that there is a material question of fact on this issue.

As for the excessive use of force claims, Lockett argues that the MP Defendants were inspired by malice when they searched him multiple times and eventually handcuffed him *only after Bieber made the allegedly racially charged statements*. In fact, Lockett notes that after the searches by the MP Defendants, which were allegedly for safety reasons, they actually allowed him to return to his vehicle *without searching the vehicle*. Lockett suggests that this indicates that the searches were performed in retaliation for his calling 911 to report racial discrimination.[17] Additionally, Lockett contends that the handcuffing caused "meaningful" injury to his wrists, for which he filed a complaint and eventually sought medical attention. As

---

[17]    Lockett further notes that, although Ahner testified that Lockett accused Ahner of being a racist and ranted about racism throughout Ahner's presence at the scene (Rec. Doc. 51-7, Deposition testimony of Ahner, pp.69-71 ), Arceneaux denied hearing this, and none of the other defendants testified regarding the alleged rant. Deposition testimony of Arceneaux, Rec. Doc. 51-4, Exhibit D, p.91. However, Arceneaux's testimony is not as clear-cut as Lockett's characterization of that testimony. In fact, Arceneaux testified that he heard Ahner and Lockett talking but *could not hear* the substance of the conversation that preceded Lockett's handcuffing. Rec. Doc. 51-4, Exhibit D, p. 91-92. Additionally, Bieber's deposition testimony does not address whether and to what extent he heard Ahner's conversation with Lockett.

such, Lockett argues that there are material issues of fact regarding his claims of excessive force.

Lockett next contends that his claims of unreasonable search and seizure are validated by the fact that he was searched four different times and unreasonably detained for over an hour, all for what started as a simple traffic stop. Under the Supreme Court's decision in <u>Terry v. Ohio</u>, Lockett argues that the continuation of the stop extended beyond the time that any reasonable suspicion existed to continue the stop. 392 U.S. 1 (1968). In this context, Lockett argues that he was only searched by Bieber *after* the allegedly racial statements, and by Arceneaux only *after* he called 911 to report the alleged racial harassment. Furthermore, Lockett notes that Bieber's own testimony indicates that Lockett's detention continued *only because he called 911 to report the alleged racial harassment*. Rec. Doc. 51-3, Exhibit C, p.p.67-68. Lockett argues that this admitted reason does not constitute reasonable suspicion for the continued detention, and to the contrary suggests an ill-motive and abuse of power. Likewise, Lockett argues that although Ahner arrived on the scene, searched him again, and handcuffed him, Ahner specifically denied arresting Lockett, noting that NOPD was to make the actual arrest. Rec. Doc. 51-7, p. 35. Based on these circumstances, Lockett argues that his claims of unreasonable search and seizure are viable on the present record.

As for his claims under § 1985 and § 1986, Lockett contends that because the MP Defendants were members of the National Guard and Fletcher was a member of the NOPD at the time of the events in question, the intracorporate identity theory is inapplicable. Likewise, Lockett contends that he has sufficiently alleged racial animus to support his claims, in the form of Bieber's alleged statement and the MP Defendants' reaction to Lockett's 911 call. Based on the argued validity of his § 1985 claims, Lockett contends that the State Defendants' contingent opposition to his § 1986 claims also fails. Finally, Lockett acknowledges that he has not asserted a § 1985 claim against officers Thomas, Gaines, and Clark, but only because they did not directly engage in the alleged conspiracy. Nonetheless, Lockett contends that his § 1986 claims against those officers is nonetheless valid because, despite their non-participation in the alleged conspiracy, they did not intervene to prevent the violation of Lockett's civil rights. In the end, Lockett admits that a § 1985 conspiracy must exist to support a § 1986 claim, but disputes the State Defendants' position that the defendants in each claim must be identical.

With respect to their various state law claims, Plaintiffs assert that the multiple immunities invoked by the State Defendants are inapplicable. First, §9:2798.1 immunity only applies in the context of discretionary acts. Plaintiffs argue

that Defendant Thomas is not entitled to this immunity because the claims against him do not involve his discretionary acts as a state police officer, but rather implicate his failure to uphold his duty to prevent violations of civil rights.  Next, Plaintiffs argue that § 29:23 National Guard immunity does not apply to protect the MP Defendants because § 29:23 must be read together with §29:23.1.  Plaintiffs argue that § 29:23.1 limits immunity for national guardsmen to situations in which "the national guardsmen [are] employees of the United States of America for purposes of respondeat superior liability under the Federal Tort Claims Act."  La. Rev. Stat. Ann. § 29:23.1.  Further, § 29:23.1 provides the following:

> This Section is not intended to prevent Civil Code Article 2320 or other such laws from imposing master-servant liability on the state, or to prevent Civil Code Articles 2315 et seq. generally from imposing liability in circumstances to which such codal articles and/or laws would otherwise impose liability for damages caused by the offenses or quasi offenses of members of the National Guard committed within the course and scope of their National Guard duties when the Federal Tort Claims Act does not apply.

Id.  Under this section, Plaintiffs argue that the MP Defendants are not immune from suit under state law.  See Giardina v. Lawrence, 2009 WL 1158857, *2 (E.D. La. Apr. 29, 2009).  Finally, Plaintiffs argue that the State Defendants' reliance on § 29:735(a)(1) is also misplaced because the events at issue here occurred 3 years after Hurricane Katrina, and thus were not in the context of homeland security or emergency preparedness.  As

such, because §29:735(a)(1) immunity has been limited to events contemporaneous or directly in preparation for emergent events, the immunity does not apply. See In Re Katrina Canal Breaches Consolidated Litigation, 2008 WL 4691623 (E.D. La. Oct. 22, 2008). Additionally, Plaintiffs note that §29:735(a)(1) immunity does not apply to wilful violations, and thus contend that their claims that the State Defendants trumped up charges against Lockett to validate his arrest amount to wilful violations.

Finally, Mrs. Lockett argues that her claims for emotional distress are valid as she is a proper party under Article 2315.6 and experienced mental distress while observing her husband's arrest. Mrs. Lockett distinguishes the Irvin decision relied on by the State Defendants. Mrs. Locket notes that the plaintiff's claims in that case were dismissed based on the fact that witnessing her daughter's arrest alone was not the type of event contemplated by the statute because plaintiff was not aware that her daughter would die as a result. In contrast, Mrs. Lockett actually witnessed both her husband's arrest as well as the alleged hostility, discrimination, embarrassment,[18] and anxiety that he endured throughout the process. As such, because she contemporaneously witnessed both the arrest and the various effects of that arrest, Mrs. Lockett contends that her emotional

_____

[18] Mrs. Lockett notes that her husband had recently run for political office, intends to pursue a political career, and has recently begun law school.

distress claims are viable.

### 3) Parties' Reply/Sur Reply Arguments

In reply, the State Defendants argue that Lockett *has never denied* that he was speeding. Further, despite Lockett's attempts to create issues of fact regarding Bieber and Arceneaux's testimony as to *how far over* the speed limit he was traveling, the State Defendants contend that Lockett's actual speed is irrelevant. Specifically, the State Defendants assert that "[i]t is not material how much in excess of the 45 m.p.h. speed limit Lockett was traveling" and that "Plaintiffs' attempt to create an issue of fact with respect to how fast Lockett was driving, or what time he was pulled over or the distance between the MP sedan and Lockett's vehicle . . . are of no moment." Rec. Doc. 72, p.2. The State Defendants reiterate their position that Bieber and Arceneaux had probable cause to stop and arrest Lockett for traffic violations.

Furthermore, as for Lockett's excessive force and search and seizure claims, the State Defendants contend that Lockett has offered no evidence to overcome their entitlement to qualified immunity. In sum, the State Defendants argue that the only support for Lockett's claims on these grounds are his own self-serving opinions regarding the various defendants intent in arresting him, as well as counsel's mere assertions and conclusory legal arguments. The State Defendants contend that an

officer's right to conduct a brief investigatory stop carries with it the right to use reasonable force to effectuate that stop. See <u>Muehler v. Mena</u>, 544 U.S. 93 (2005). Both Arceneaux and Ahner testified that Lockett's demeanor was angry and rude, to the point that they thought he could pose a danger. Ahner further stated that he decided to handcuff Lockett only after he spoke with Lockett and determined that he was being uncooperative and might pose a threat.[19] As such, the State Defendants argue that Arceneaux and Ahner's conduct did not constitute excessive force or unreasonable search and seizure because probable cause to arrest preceded the search.

Additionally, the State Defendants argue that Plaintiffs have presented no further support of their § 1985 and §1986 claims beyond Lockett's internalized interpretation of Bieber's statement. More importantly, the State Defendants argue that Plaintiffs have not presented *any actual evidence* of a conspiracy. Likewise, the State Defendants note that Plaintiffs have not offered any additional law on the issue of whether their § 1986 claims can proceed in the absence of some valid § 1985 claim.

As for the issues of state-law immunity, the State Defendants note that Defendant Thomas is immune under § 9:2798.1

---

[19]  The State Defendants argue that Lockett's level of uncooperativeness is apparent in the audio of his 911 call, manually attached as Exhibit E to Plaintiffs' Opposition.

because his failure to intervene in the events leading up to Lockett's arrest was discretionary, and thus fell within the ambit of the statutory immunity. Furthermore, the State Defendants note that § 9:2798.1 immunity extends even to negligently performed discretionary acts, and thus Thomas's alleged negligent failure to intervene does not vitiate his immunity. Additionally, as to Plaintiffs' argument regarding national guardsmen's immunity, the State Defendants recognize that §23.1 does not relieve the *State* of master-servant liability for acts performed by national guardsmen in service of the State. However, the State Defendants also note that Plaintiffs *have not sued the State*, but rather have sued the MP Defendants in personam, and thus the immunity provided in §29:23 applies *as to the individual guardsmen defendants*. The State Defendants also contend that §29:735(a)(1) immunity does apply because the NGTF operations were the result of the Governor's extension of the state of emergency caused by Katrina.

Finally, the State Defendants again cite <u>Irvin</u> in support of their position that Mrs. Lockett simply has not factually asserted a claim under Article 2315.6 for bystander emotional damages.

Plaintiffs in reply concede that Arceneaux and Bieber may have had probable cause to effect a stop of Lockett's vehicle, but again note that both Arceneaux and Bieber admitted that the

40

violations for which they stopped Lockett *did not warrant arrest*, and were in fact initially only going to elicit a warning. However, Plaintiffs argue that Bieber has admitted that he detained Lockett not because of the traffic violations, but as the result of his 911 call regarding racial discrimination. Based on this admission, Plaintiffs argue that all actions taken by the State Defendants after the 911 call - including the searches, handcuffing, and arrest - were without probable cause, thus vitiating any qualified immunity.

Likewise, Plaintiffs dispute the State Defendants' position that there is no evidence of fabricated offenses against Lockett. Plaintiffs point out that Lockett testified that he was only informed of the speeding violation, and Mrs. Lockett's hand written notes from the scene only reference the speeding violation.

Additionally, Plaintiffs argue that there is a question of fact as to whether Bieber's call reporting the traffic stop preceded Lockett's 911 call or vice-versa. Plaintiffs cite the tape of Bieber's call to dispatch, which includes radio transmissions all the way through Lockett's arrival at central lockup. However, the tape does *not* include a 911 dispatch in response to Lockett's 911 call. Plaintiffs argue that this proves that Lockett's 911 call preceded Bieber's call reporting the traffic stop, which presents an issue of fact regarding

whether Bieber's reporting of the stop was in response to Lockett's 911 call regarding racial discrimination.[20]

Plaintiffs also contend that the conflict between the deposition testimony of various of the State Defendants in comparison with the incident reports in this case reveal that the reports were fabricated. Plaintiffs argue that this constitutes "absolute evidence" of malice to support a claim for unreasonable search and seizure.

Finally, Plaintiffs reiterate their arguments that (1) their allegations and the record support their § 1985 and § 1986 claims; (2) that none of the State Defendants are entitled to any state-law immunity; and (3) that Mrs. Lockett has asserted a viable claim for bystander damages under Article 2315.6.

**B. DISCUSSION**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>Little v. Liquid Air</u>

---

[20] The Court notes at this point that Plaintiffs have not presented either a transcript or the audio of the Incident Recall Log that includes recordings of radio transmissions beginning with Bieber's call regarding the traffic stop and continuing through Lockett's booking. Additionally, the Court notes that the only summary judgment evidence in the record indicates simply that Bieber's call was at 9:13:32 a.m., and that Lockett's 911 call was at 9:13 a.m. as well.

Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citing Fed. R. Civ.

Proc. 56(c)).  The moving party bears the initial burden of

demonstrating to the court that there is an absence of genuine

factual issues. Id. Once the moving party meets that burden, the

non-moving party must go beyond the pleadings and designate facts

showing that there is a genuine issue of material fact in

dispute. Id.  "A factual dispute is 'genuine' where a reasonable

jury could return a verdict for the non-moving party. If the

record, taken as a whole, could not lead a rational trier of fact

to find for the non-moving party, then there is no genuine issue

for trial and summary judgment is proper."  Weber v. Roadway

Exp., Inc., 199 F.3d 270, 272 (5th Cir. 2000) (citations

omitted). The non-moving party's burden "is not satisfied with

'some metaphysical doubt as to the material facts,' by

'conclusory allegations,' by 'unsubstantiated assertions,' or by

only a 'scintilla' of evidence. [The courts] resolve factual

controversies in favor of the nonmoving party, but only when

there is an actual controversy, that is, when both parties have

submitted evidence of contradictory facts. *[The courts] do not,*

*however, in the absence of any proof, assume that the nonmoving*

*party could or would prove the necessary facts.*" Little, 37 F.3d

1075  (emphasis in original)(citations omitted).

The Court will address each of Plaintiff's claims, and the

State Defendants' various grounds for summary judgment as to

those claims, in order.

**(1)  § 1983 Claims**

Lockett asserts claims under § 1983 against the MP

Defendants[21] for false arrest, excessive force, and

unconstitutional search and seizure.  The MP Defendants generally

assert qualified immunity as a defense to these claims.

"The doctrine of qualified immunity protects government

officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known.' " <u>Pearson v. Callahan</u>, --- U.S. ----, 129 S. Ct. 808, 815

(2009).  Afer a defendant has invoked qualified immunity, the

burden shifts to the plaintiff to demonstrate the inapplicability

of the defense.  <u>Club Retro LLC v. Hilton</u>, --- F.3d ----, 2006 WL

6245546, *5 (5th Cir. May 6, 2009) (citing <u>McClendon v. City of</u>

<u>Columbia</u>, 305 F.3d 314, 323 (5th Cir.2002) (en banc)).  To

discharge this burden, a plaintiff must: (1) "claim that the

defendants committed a constitutional violation under current

law"; and (2) "that the defendants' actions were objectively

unreasonable in light of the law that was clearly established at

the time of the actions complained of." <u>Id.</u> (citing  <u>Atteberry v.</u>

---

[21]  The Court recognizes that the § 1983 claims are also
asserted against Gains, Clark, and Fletcher as well, but focuses
solely on the claims against the MP Defendants in this order and
reasons.

<u>Nocona Gen. Hosp.</u>, 430 F.3d 245, 253 (5th Cir.2005)).[22]  "To be

'clearly established' for purposes of qualified immunity, '[t]he

contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing

violates that right.' " <u>Kinney v. Weaver</u>, 367 F.3d 337, 349-50

(5th Cir.2004) (en banc) (alteration in original).  Given the

fundamentally objective inquiry that drives a qualified immunity

analysis, "a defense of qualified immunity may not be rebutted by

evidence that the defendant's conduct was malicious or otherwise

improperly motivated [because] [e]vidence concerning the

defendant's subjective intent is simply irrelevant to that

defense." <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 (1998).

     In this case, Lockett has alleged three constitutional tort

claims: (a) wrongful arrest; (b) excessive use of force; and (c)

unreasonable search and seizure.  The Court will address in turn

each claim under the two-pronged qualified immunity inquiry.

     **(a)  False Arrest**

     First, as for Lockett's false arrest claims there is no

---

     [22]  This two-pronged inquiry was set out in <u>Saucier v. Katz</u>,
533 U.S. 194, 201 (2001). Recently, the Supreme Court modified
its holding in <u>Saucier</u> to state that the sequence of this inquiry
is no longer mandatory, and that lower courts may use their
discretion in deciding whether to apply the <u>Saucier</u> procedure.
<u>Pearson v. Callahan</u>, 129 S. Ct. 808, 2009 WL 128768 (Jan. 21,
2009). Thus, in analyzing the right to qualified immunity,
district courts are now free to determine, in whichever order
they choose, whether a plaintiff has met the burden of showing
that he has alleged an actual constitutional violation or whether
the right at issue is clearly established.

doubt that "[a]n arrest is unlawful unless it is supported by probable cause." Deville v. Marcantel --- F.3d ----, 2009 WL 1162586, *4 (5th Cir. May 1, 2009) (citing Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." Resendiz v. Miller, 203 F.3d 902, 903 (5th Cir.2000). "If there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." Wells v. Bonner, 45 F.3d 90, 95 (5th Cir.1995). Additionally, "[a]n officer may conduct a warrantless arrest based on probable cause that an individual has committed even a minor offense, including misdemeanors." Deville, 2009 WL 1162586 at *4 (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)). Furthermore "evidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest because probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. As such, an officer's own uncontradicted testimony regarding the occurrence of an arrestable violation can by itself support a finding of probable cause, even in the face of plaintiff's denial of that violation.

46

<u>Id</u>.  In the end, even "if officers of reasonable competence could disagree on whether or not there was probable cause to arrest a defendant, immunity should be recognized." <u>Gibson v. Rich</u>, 44 F.3d 274, 277 (5th Cir.1995).

In this case, both Bieber and Arceneaux testified that they stopped Lockett for speeding, running a red light, and running a stop sign.  See Rec. Doc. 51-3, pp.31-32; Rec. Doc. 51-4, p.75. Based on this testimony, Bieber and Arceneaux were clearly justified in stopping Lockett's vehicle based on their observation of what they objectively believed to be traffic violations.  See <u>Whren v. United States</u>, 517 U.S. 806 (1996). Additionally, these violations, supported by the testimony of Bieber and Arceneaux and at least in part undenied by Lockett, gave rise to probable cause for Lockett's arrest for reckless driving, which was effected upon arrival of the NOPD officers. The State Defendants have noted in reply, and the Court agrees, that although Lockett has questioned the various accounts of how fast he may have been going prior to the traffic stop, and denied at his deposition that he ran the red light and the stop sign, he has never expressly denied the fact that he was speeding prior to the stop.  In any event, Lockett's doubts about the validity of the basis for his traffic stop and arrest do not defeat the Court's finding of probable cause based on the testimony of the officers.  <u>Deville</u>, 2009 WL 1162586 at *4.  Furthermore, although

Lockett points out that Bieber and Arceneaux both testified that
they initially only intended to issue a warning, this subjective
intent has no effect on the validity of the probable cause
arrest. See Rec. Doc. 51-3, Exhibit C, p. 67; Rec. Doc. 51-4,
Exhibit D, pp. 123-24. As the Supreme Court held in <u>Ohio v.</u>
<u>Robinette</u>, citing <u>Whren</u>:

> the fact that [an] officer does not have the state of
> mind which is hypothecated by the reasons which provide
> the legal justification for the officer's action does not
> invalidate the action taken as long as the circumstances,
> viewed objectively, justify that action . . . .
> Subjective intentions play no role in ordinary,
> probable-cause Fourth Amendment analysis.

519 U.S. 33, 37 (1996). Additionally, while Lockett notes
Bieber's testimony that in his opinion it would be inappropriate
to handcuff someone for a minor traffic violation, Rec. Doc. 51-3
at p. 71-72, the fact that Bieber may have had a different
appreciation than other officers regarding the probable cause for
Lockett's arrest does not vitiate the validity of the arrest.
First of all, the Fifth Circuit in <u>Deville</u> noted the Supreme
Court's holding that even minor traffic violations may give rise
to probable cause for arrest. Second, Arceneaux and Bieber
informed their supervisor Ahner of the traffic violations they
had witnessed Lockett commit. Ahner testified that the NOPD made
the final determination regarding whether to arrest Lockett based
on those traffic violations. Rec. Doc. 51-7, p. 90. As such,
while Bieber may not have subjectively believed there was

probable cause to arrest, "if officers of reasonable competence
could disagree on whether or not there was probable cause to
arrest a defendant, immunity should be recognized." Gibson v.
Rich, 44 F.3d 274, 277 (5th Cir.1995). Additionally, "where a
police officer makes an arrest on the basis of oral statements by
fellow officers, an officer will be entitled to qualified
immunity from liability in a civil rights suit for unlawful
arrest provided it was objectively reasonable for him to believe,
on the basis of the statements, that probable cause for the
arrest existed." Deville, 2009 WL 1162586, *6 (citing Rogers v.
Powell, 120 F.3d 446, 455 (3d Cir. 1997)). Thus, because there
is no evidence that Ahner had any reason to disbelieve Bieber and
Arceneaux's account of Lockett's traffic violations, he is
likewise entitled to qualified immunity as to Lockett's false
arrest claims.

Lockett contends that there is no evidence in any of the
statements of the MP Defendants or in the incident reports
generated from his arrest that support a specific probable cause
finding as to the reckless driving offense for which he was
ultimately arrested. Likewise, Lockett suggests, on the basis of
argument and speculation, that the MP Defendants fabricated the
red light and stop sign violations after he made allegations of
racial discrimination in order to support his arrest. These
contentions in opposition to the MP Defendants' claims of

qualified immunity are unavailing. Lockett is correct that the

elements of the crime of reckless driving include (1) operation

of a vehicle and (2) criminal negligence. However, Lockett's

contention that the lack of any reference to endangerment in the

MP Defendants' reports results in a failure of probable cause as

to the crime of reckless driving does not withstand scrutiny.

First of all, Arceneaux noted in his deposition testimony that he

initially wanted to warn Lockett about his driving due to the

fact that the area in which his violations took place is

relatively busy, including a prevalence of youth pedestrian

traffic. Rec. Doc. 51-4, p.123. Additionally, the definition of

"criminal negligence" is extremely broad and circumstance-

specific: "such disregard of the interest of others that the

offender's conduct amounts to a gross deviation below the

standard of care expected to be maintained by a reasonably

careful man under like circumstances." Louisiana Revised

Statutes § 14:12. Given this broad definition and the

circumstances of the case, Bieber and Arceneaux had probable

cause to arrest for reckless driving based on the traffic

violations they witnessed. Furthermore, Lockett's resort to the

elements of the crime of reckless driving is misplaced because

the probable cause standard does not consider whether the

defendant is actually innocent of the crime for which he is

arrested, but merely addresses whether there is a probability or

substantial chance that the crime was committed.  Additionally, and as noted earlier, "[i]f there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." Wells v. Bonner, 45 F.3d 90, 95 (5th Cir.1995).  With this principle in mind, the Court notes that Louisiana courts have held that even the offense of "careless driving," which both Bieber and Arceneaux testified was a proper characterization of Lockett's traffic violations, constitutes an arrestable offense.  See State v. Short, 839 So.2d 173 (La. App. 4 Cir. 2003) ("It is undisputed that the officers saw the defendant commit a traffic offense. At that point, they had probable cause to stop him for the commission of that offense. See State v. Wilson, 467 So.2d 503, 515 (La.1985); State v. Diaz, 2001-0523 (La. App. 4 Cir. 10/31/01), 800 So.2d 1090)). As such, Lockett's attempts to defeat the MP Defendants' qualified immunity are unsuccessful.

Furthermore, the intervening events alleged by Lockett in support of his claims attempt to call his eventual arrest into question based on the subjective intent of Bieber and Arceneaux in responding to his protestations of racial discrimination and calling their supervisor Ahner to the scene.  However, given the existence of probable cause for Lockett's arrest based on his traffic violations, these various intervening subjective aspects of the detention and arrest, which take up the majority of

Lockett's opposition and reply memoranda, are irrelevant. In fact, the Supreme Court has held that "[o]ur cases make clear that an arresting officer's state of mind (except for the facts that he knows) is *irrelevant to the existence of probable cause.*" Devenpeck v. Alford, 543 U.S. 146, 153 (U.S. 2004).

Finally, this case is distinguishable from the Fifth Circuit's decision in Deville, which held that an officer was not entitled to qualified immunity based on the fact that the plaintiff, who was arrested for speeding and refusing to sign a traffic citation, "provided evidence that would allow the jury to disbelieve [the officer's] testimony" that supported his argument for probable cause. 2009 WL 1162586 at *5. Specifically, the Fifth Circuit noted that the defendant officer "admitted that he has a history of problematic arrests and that citizens have made complaints against him"; admitted that he had previously filed false charges against another individual; and was unable to verify the actual speed at which plaintiff was traveling, which precluded him from refuting Plaintiff's sworn affidavit statement that her cruise control was set on 40 m.p.h. at the time of the alleged violation. Id. The egregious history of the officer in Deville is clearly distinguishable from the circumstances of the present case, in which there is no evidence that any of the MP Defendants have any history of improper arrests. Thus, even though the officer's testimony in Deville was insufficient to

support a finding of probable cause, the context of that testimony is drastically different than the statements of the MP Defendants in this case.

Accordingly, the MP Defendants' motion for summary judgment as to Lockett's claims of false arrest should be granted on the basis of qualified immunity. Lockett has not proven that his arrest was not based on probable cause, and thus has not met the first prong of the <u>Saucier/Pearson</u> test, as he has failed to show any constitutional violation resulting from the MP Defendants' actions.

### (b) Excessive Use of Force

Lockett also asserts claims under § 1983 for excessive use of force by the MP Defendants. The Fourth Amendment's protection against unreasonable search and seizures requires that officers refrain from using excessive force when effectuating an arrest. <u>Graham v. Connor</u>, 490 U.S. 386, 394-95 (1989). The Supreme Court has described this inquiry as a broadly based, objective one:

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

<u>Id</u>. at 397 (citations omitted). In the Fifth Circuit "[i]t is

53

clearly established law . . . that in order to state a claim for

excessive force in violation of the Constitution, a plaintiff

must allege (1) an injury, which (2) resulted directly and only

from the use of force that was clearly excessive to the need; and

the excessiveness of which was (3) objectively unreasonable."

United States v. Brugman, 364 F.3d 613, 616 (5th Cir. 2004)

(citing Bazan v. Hidalgo County, 246 F.3d 481, 487 (5th

Cir.2001)).[23]  Further, "[a]lthough a showing of 'significant

---

[23]  Lockett cites the Fifth Circuit's holding in Hinojosa v.
City of Terrell, Texas, for the analysis required in an excessive
force claim under § 1983 and the Fourth Amendment:

> If the state officer's action caused severe injuries, was
> grossly disproportionate to the need for action under the
> circumstances, and was inspired by malice rather than
> merely careless or unwise excess of zeal so that it
> amounted to an abuse of official power that shocks the
> conscience, it should be redressed under Section 1983.

834 F.2d 1223, 1229 (5th Cir. 1988) (citing Coon v. Ledbetter,
780 F.2d 1158, 1163 (5th Cir.1986)).  The Court notes here that
Hinojosa does not provide the governing standards for § 1983
excessive force claims under the Fourth Amendment.  First, there
is no longer a "severe injury" requirement for such claims.
Hudson v. McMillan, 503 U.S. 1, 4 (1992).  Second, the "malice"
inquiry is no longer relevant to such claims:

> In an en banc opinion immediately following [the
> Supreme Court's decision in] Graham, [the Fifth
> Circuit] stated, "A plaintiff can thus prevail on a
> Constitutional excessive force claim by proving each of
> these three elements: (1) a significant injury, which
> (2) resulted directly and only from the use of force
> that was clearly excessive to the need; and the
> excessiveness of which was (3) objectively unreasonable
> . . . . [The Fifth Circuit thereby] overrule[d] all
> previous decisions of . . . to the contrary." Johnson
> v. Morel, 876 F.2d 477, 480 (5th Cir.1989) (en banc)[].
> Thus . . . the excessive force standard had been

injury' is no longer required in the context of an excessive
force claim, [the Fifth Circuit] does require a plaintiff
asserting an excessive force claim to have suffered at least some
form of injury." Glenn v. City of Tyler, 242 F.3d 307, 314 (5th
Cir. 2001) (internal quotations omitted). As such, "[t]he injury
[alleged] must be more than a de minimis injury and must be
evaluated in the context in which the force was deployed." Id.
Under this standard, the Fifth Circuit has held that "handcuffing
too tightly, without more, does not amount to excessive force" in
the context of a probable cause arrest. Id.

As an initial matter, the Court notes that the Fifth
Circuit's holding in Glenn squarely defeats Lockett's claims of
excessive force, insofar as they are based on the alleged
tightness of his handcuffs.

Nonetheless, even if the handcuffing were sufficient to
state an injury under the excessive force analysis, and even if

---

changed so that the injury had to be "significant"
instead of "severe" and also **malice was no longer an
element**.

Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992) (concerning
excessive force allegations in the context of a wrongful arrest).
While the "significant injury" requirement of Johnson v. Morel
has since been altered to the mere "injury" requirement as noted
in Brugman, the "malice" factor of Hinojosa is clearly no longer
applicable to excessive force claims in the Fifth Circuit. Thus,
Lockett's arguments based on that factor are irrelevant, and the
Court's inquiry focuses solely on the objective reasonableness of
the force used by the MP Defendants vis-a-vis the need in the
circumstances.

Lockett's additional bases for his excessive force claims – namely the various searches performed during his detention– could constitute some form of "injury," Lockett's excessive force claims still fail. First, based on the above-cited precedent, Lockett's arguments concerning the alleged malice of the MP Defendants are irrelevant as a matter of law. As the Supreme Court noted in <u>Graham</u>, even "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." 490 U.S. at 397. Any allegation, even assuming it were valid, that the MP Defendants' were inspired by some sort of racial animus in their treatment of Lockett is entirely misplaced in terms of an excessive force claim.[24] As such, the sole inquiry into Lockett's claims of excessive force must focus on the objective reasonableness of the force used in his detention and arrest in light of the need for such force in the circumstances.

Under this objective inquiry, the Court finds that the MP Defendants' treatment of Lockett during the traffic stop and ensuing detention fell far short of the level of excessive force required to state a claim under § 1983. Initially, the Court notes that Lockett has not alleged nor even argued any *actual injury*, mental, physical, de minimis, or otherwise, arising from

---

[24] In any event, the Court does not find that any of the MP Defendants exhibited any actual malice on the present record.

the *three searches* performed by Bieber, Arceneaux, and Ahner. Furthermore, even if those searches were in some way slightly injurious, they were performed, according to the officers, simply to ensure their safety in what was by all accounts a somewhat uneasy atmosphere. In sum, the Court finds that Lockett has failed to show a constitutional violation in his allegations of excessive force, and thus has failed to meet the first prong of the Saucier/Pearson test. As such, the MP Defendants are entitled to qualified immunity on Lockett's excessive force claims.

### (c)  Unconstitutional Search and Seizure

Lockett finally alleges a general claim for violation of his Fourth Amendment right to be free from unreasonable search and seizure. Lockett relies on the Supreme Court's decision in Terry v. Ohio to argue that reasonable suspicion supporting his traffic stop was terminated at the point when the stop became a detention after the allegedly racially charged statements by Bieber. In other words, Lockett argues that the stop morphed from a Terry traffic stop to a baseless and unconstitutional seizure in retaliation for his questioning of Bieber's statement. He also argues that the three searches performed on him by the MP Defendants violated Terry.[25]

---

[25]  There is some question on the present record regarding the number of searches and who performed them. Lockett's testimony indicates that Bieber, Arceneaux, and Ahner all frisked

Whether a traffic stop constitutes a violation of a person's Fourth Amendment rights is analyzed under the standard announced in Terry v. Ohio, 392 U.S. 1 (1968); United States v. Brigham, 382 F.3d 500, 506-07 (5th Cir. 2004). The analysis considers (1) "whether the officer's action was justified at its inception"; and (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Brigham, 382 F.2d at 506.  Under Terry, "[o]nce an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion" to justify continued detention.  United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).  Furthermore, in the context of a Terry-type traffic stop and consistent with the Fourth Amendment's prohibition of unreasonable searches and seizures, an officer may perform a brief frisk of the driver if the frisk is based on reasonable suspicion that the driver may be armed and dangerous.  Arizona v. Johnson, 129 S. Ct. 781 (2009).  "There is no Terry violation if the searching officer can point to specific

---

him at various points during the stop, and that NOPD officer Gains also patted him down.  Rec. Doc. 51-1, p. 35 (Bieber), p. 50 (Arceneaux), p. 61 (Ahner), p. 104 (Gains).  Bieber's testimony seems to indicate that Arceneaux, and not he, performed the initial frisk.  Rec. Doc. 51-3, pp.36-37.  Arceneaux testified that only three frisks took place – the first by himself, the second by Ahner, and the third by Gains or Clark. Rec. Doc. 51-4, p. 59-60.  In light of the somewhat vague record, the Court will assume that three frisks by the MP Defendants took place in accordance with Lockett's testimony.

and articulable facts suggesting actual physical risk to himself or others." <u>United States v. Sykes</u>, 2006 WL 3193745, *5 (E.D. La. Nov. 6, 2006). In any event, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>Grant</u>, 349 F.3d at 196 (quoting <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983)). Likewise, a <u>Terry</u>-type detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." <u>United States v. Brigham</u>, 382 F.3d 500, 507 (5th Cir. 2004).

The Fifth Circuit, "following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as <u>Terry</u> stops." <u>Brigham</u>, 382 F.3d at 506.[26] In assessing whether a detention has lasted

---

[26] However, the Court notes the Fifth Circuit's following recognition

> that at least one of our sister circuits has recently suggested that different constitutional standards may apply to stops based on probable cause. See <u>United States v. Childs</u>, 277 F.3d 947, 952-54 (7th Cir.2002) (en banc) (noting that the Fourth Amendment allows for a broader range of law enforcement actions where a traffic stop is supported by probable cause); see also <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 n. 29, 104 S.Ct. 3138, 3150 n. 29, 82 L.Ed.2d 317 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a <u>Terry</u> stop.").

<u>Brigham</u>, 382 F.3d at 506 n.4.

longer than necessary, the Fifth Circuit examines "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Thibodeaux, 276 Fed. Appx. 372, 375 (5th Cir. 2008) (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)). Under Terry, the Fifth Circuit has recognized that certain activities, including "requesting documents such as driver's licenses, registrations, or rental papers; running a computer check on those documents; and asking questions about the purpose and itinerary of a driver's trip," are all appropriate within the scope of the Terry-type traffic stop.  Id.  In this analysis, as in any Fourth Amendment inquiry, reasonableness is the "touchstone," as determined in the totality of the circumstances. Brigham, 382 F.3d at 507.

In this case, the Court finds, in the totality of the circumstances, that Lockett's detention was not of an unreasonable duration, in the totality of the circumstances, to constitute an *illegal seizure* under Terry and its progeny. First, the events during the initial scope of the stop, in light of its probable cause basis resulting from Lockett's traffic violations, were preliminarily within the admissible range of activities allowed under the Fifth Circuit's Terry jurisprudence. After Lockett pulled over, Bieber approached the vehicle and

asked him various questions about where he was going and whether there was an emergency. During this initial exchange, Bieber made the allegedly racially charged statement that prompted Lockett to dial 911 and request the presence of the NOPD. In the meantime, Arceneaux had approached the vehicle and asked Bieber for his license, registration, and proof of insurance. All these initial procedures were well within the permissible scope of a Terry-type traffic stop. However, after Locket procured the dispatch of NOPD officers by his 911 call, Bieber and Arceneaux called their supervisor Ahner to report the clearly escalating situation. At this point, the continued duration of the initial stop was the result of Lockett's own involvement of the NOPD. The Fifth Circuit in Thibodeaux noted that if a Terry-type stop continues for reasons beyond the officer's control and resulting from the detainee's own actions, the extended duration may not violate the principles of Terry. 276 Fed. Appx. at 375 (noting that detainee's own evasive and inconsistent answers necessitated the continuation of the initial stop). Additionally, while the MP Defendants initial suspicions regarding Lockett's traffic violations may have been verified or dispelled soon after the stop occurred, the involvement of the NOPD necessitated the prolongation of the stop. Likewise, there was the outstanding issue of Lockett's expired insurance card, which apparently was never resolved as a result of the escalation of the stop. In

61

light of all these circumstances, the Court finds that the MP
Defendants were initially justified in stopping Lockett, and
likewise finds that the MP Defendants' subsequent actions
prolonging the detention after the initial stop were reasonably
related in scope to the circumstances that justified the stop.

However, the Court also concludes that the various frisks
and/or searches performed by the MP Defendants constituted
*illegal searches* under <u>Terry</u>.  The Court notes that there is no
evidence whatsoever regarding whether Bieber, Arceneaux, or Ahner
had any reasonable suspicion based on articulable facts to
believe that Lockett was armed or dangerous during the course of
the traffic stop so as to justify the <u>Terry</u>-type weapons pat-
down.  In fact, Bieber and Arceneaux even allowed Lockett to
return to his vehicle after the two initial searches, which
suggests that they did *not* have any reasonable suspicion to
believe that Lockett was armed.  See <u>Estep v. Dallas County,</u>
<u>Tex.</u>, 310 F.3d 353, 360 n.7 (5th Cir. 2002) (finding that
defendant officer performed an illegal passenger compartment
search under <u>Terry</u> based in part on the fact that his "contention
that he was truly in fear for his safety [was] belied by the fact
that he never searched [the detainee's] person for weapons").
In this regard, the present case is similar to the circumstances
of <u>Sykes</u>, in which the court held that a pat-down search incident
to a traffic stop for failure to signal lane change and erratic

driving was not justified by reasonable suspicion.  2006 WL
3193745 at *6-7.  Although the initial stop was justified by the
traffic violation, the Sykes court held that the officer's
testimony that the detainee was "nervous and shaking and sweaty"
did not rise to the level of specific articulable facts and
appropriate inferences to support a reasonable suspicion that the
detainee was armed.  Id.  In this case, there is no testimony or
evidence *whatsoever* regarding any grounds for reasonable
suspicion by the MP Defendants that Lockett was armed and
dangerous.  While Arceneaux did testify that he frisked Lockett
because he "was very worked up" and "might become angry to the
point of combativeness," this vague testimony does not support
reasonable suspicion that Lockett was armed to support a Terry
frisk.  Rec. Doc. 51-4, p.84-85.  Additionally, Ahner's testimony
regarding his pat-down search of Lockett is devoid of any mention
whatsoever of a concern regarding the possible presence of a
weapon.  Rec. Doc. 51-7, pp.72-73.

    As such, Lockett does state a claim under § 1983 and Terry
based on the various searches during the traffic stop, and thus
satisfies the first prong of the Saucier/Pearson test.  However,
as noted earlier, this does not end the qualified immunity
analysis.  The second step of the Saucier/Pearson test requires a
court "to ask whether the contours of the constitutional right in
question were sufficiently clear that a reasonable officer would

understand that what he is doing violates that right."  Estep,
310 F.3d at 360.

The Fifth Circuit has held, in the context of a
Terry vehicle frisk incident to a speeding stop in which the
officer had no reasonable suspicion in the circumstances to
believe that the detainee was armed, that such a "constitutional
violation . . . is clear-cut and obvious [because] . . . [n]o
reasonable police officer could have really believed that a
search was constitutional under the circumstances presented."
Id. at 361; see also James v. Sadler, 909 F.2d 834, 838 (5th Cir.
1990) ("The right to be free from an unreasonable pat-down search
is a constitutional right sufficiently contoured to remove the
defendant's actions from the protection of the immunity
doctrine.").  However, the circumstances of this case are
crucially different from those at issue in Esteps based on the
fact that the MP Defendants *had probable cause to arrest* Lockett
based on *multiple traffic violations*.  The Supreme Court in
Berkemer and the Fifth Circuit in Brigham have both recognized
that a traffic stop supported by probable cause may, in some
circumstances which neither court elaborated upon, exceed the
bounds set by the Fourth Amendment on the scope of a Terry stop.
Thus, the delineation between the permissible scope of "officer
safety" frisks under Terry in the context of *reasonable suspicion*
traffic stops for minor or solitary traffic violations, and the

scope of frisks incident to a *probable cause* traffic stop for arrestable violations, is not clearly defined.

In fact, the Fifth Circuit has upheld patdown searches in the context of probable cause traffic stops based on little more than the officer's testimony that the defendant gave suspicious answers to questions and immediately exited his vehicle after stopping. United States v. Huerta, 252 Fed. Appx. 694, 695-96 (5th Cir. 2007). In Huerta, the defendant was stopped for a minor speeding violation, and the Fifth Circuit found that there was probable cause for the officer to initiate the stop based on his witnessing the violation. Id. Additionally, the Huerta court affirmed the district court's finding that the officer's pat-down search of the defendant was justified based on concerns of officer safety. Id. Specifically, the court found that the defendant's answers to the officer's preliminary post-stop questions were suspicious, and that the defendant immediately approached the officer after the stop, all of which constituted sufficient grounds for the pat-down search related to safety concerns. Id. Similarly, in this case, there is some testimony that Lockett initially identified himself as an FBI agent.[27]

---

[27] Specifically, both Arceneaux and Ahner indicated that there was initially some confusion regarding whether Lockett was, or held himself out to be, an FBI agent. Arceneaux testified as follows, in reference to the written statement he and Bieber executed after the events of this case:

Q.   The statements from both you and Specialist Bieber

then go on to make the next point: "Bieber then
asked if he was in the FBI academy." Do you see
that?

A.   Yes.

Q.   Do you recall any between the "no" and the "FBI
academy?

A.   No, I don't recall.

Q.   "Suspect later learned to be Shawn Lockett
responded yes," do you see that?

A.   Yes.

Q.   That's not in quotes?

A.   No, it's not.

Q.   Do you know why?

A.   No, I don't.

Q.   Is it your contention that's the exact word that he used?

A.   Yes. Mr. Lockett responded in the affirmative to
that question at first.

Q.   "After further questioning Lockett changed his
story." What other questioning? It doesn't tell us
what questions he was asked

A.   I don't believe it was a question but I remember
Specialist Bieber asking him if he would like us to
go talk to his instructor and tell him how he was
driving on Hayne Boulevard and at that point Mr.
Lockett realized Specialist Bieber was asking him
and he said "wait, hold on, hold on. I'm not in the
FBI. I'm going to SUNO."

Rec. Doc. 51-4 at pp. 81-82. Additionally, Ahner twice noted the
initial confusion and concern over Lockett's responses to the
questions regarding the FBI:

A. (Ahner): . . . What I would like to add, however, is that I
don't believe there was enough emphasis placed on the fact
that Mr. Lockett introduced himself as a member in training
with the Federal Bureau of Investigation.

Q.   Now, when you say introduced himself as a member, he didn't
introduce himself that way to you, you are saying he
introduced himself to Bieber and Arceneaux as reported by
them?

A.   Correct.

Q.   To the extent that happened or didn't happen, you wouldn't
know one way or the other, other than what was told to you
by somebody else?

A.   Correct.

Q.   Why do you think more information would have been

Regardless of whether this initial mis-identification was the result of a misunderstanding or confusion, the possibility that Lockett was improperly identifying himself as a law enforcement officer, especially at such an early stage of the stop, would clearly have been of some concern to the MP Defendants vis-a-vis their safety. This initial concern, combined with the escalating nature of the stop as described by both Arceneaux - who indicated that Lockett "was very worked up" and "might become angry to the point of combativeness" - as well as by Lockett himself - who testified that when he called 911 "the situation look[ed] like it [was] getting out of hand" - resulted in the MP Defendants' reasonable concern for their safety, which in turn prompted the frisks.

Given the unique circumstances of this case, as well as the expressly open question in the Fifth Circuit of whether and to

---

appropriate to stress that fact more than it was stressed in your report?

A. As a law enforcement officer, when an individual attempts to impersonate the police department in any way, shape or form, he normally has another agenda, whatever that agenda may be.

***

Q. During your conversation with Bieber, did he say anything else other than everything was under control and that he would require the presence of a military police supervisor and a New Orleans police officer?

A. He mentioned to me that the individual that he stopped had identified himself as a Federal Bureau of Investigation officer trainee.

Rec. Doc. 51-7, pp. 19-20, 35.

what extent the strictures of <u>Terry</u> apply to probable cause traffic stops for arrestable offenses, the Court finds that the MP Defendants are entitled to qualified immunity as to Lockett's *illegal search* claims under <u>Terry</u>, as the right at issue was not clearly established in light of the circumstances of this case. The Fifth Circuit has noted that "[q]ualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that the conduct in question was illegal." <u>Lytle v. Bexar County, Tex.</u>, 560 F.3d 404, 410 (5th Cir. 2009). In this case, the Court finds that any mistake by the MP Defendants in frisking Lockett was reasonable given the events of the stop and the uncertainty of the law regarding the permissible scope of probable cause traffic stops. Accordingly, the MP Defendants motion for summary judgment on Lockett's *illegal search* claims should also be granted.

### 2) § 1985 and § 1986 Claims

The MP Defendants argue that Lockett's claims under § 1985(3), asserting that they and NOPD Officer Fletcher conspired to deprive him of constitutional rights, fail as a matter of law and fact, which in turn renders his § 1986 claims invalid.

"To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or

class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States." Hilliard v. Ferguson, 30 F.3d 649, 652 -653 (5th Cir. 1994). Furthermore, "to prevail under that statute, [plaintiff] must prove a discriminatory animus based on race or some other inherited or immutable class characteristic such as gender, religion or national origin or based upon political association or beliefs." Sullivan v. County of Hunt, Tex., 106 Fed. Appx. 215, 220 (5th Cir. 2004). Because a conspiracy under this section requires the involvement of two or more persons, a "corporation cannot conspire with itself any more than a private individual can." Id. In an action under § 1985(3), "specificity is required" in the context of pleading the operative facts of the conspiracy. Holdiness v. Stroud, 808 F.2d 417, 424 (5th Cir.1987). Likewise, "[t]he essence of a conspiracy is an understanding or agreement between the conspirators." Id.

The Court need not reach the question of whether the MP Defendants and Fletcher were members of the same corporate government entity, apropos of the NGTF and NOPD's joint task force operations, because Lockett's § 1985(3) claims fail on a much more fundamental basis. Specifically, the Court's reading of the present summary judgment record does not reveal any

evidence that the MP Defendants conspired either among themselves or with Fletcher to deprive Lockett of his constitutional rights based on his race.

As an initial matter, the Court fails to see how the allegedly racially charged statement by Bieber to Lockett – which constitutes the foundation of all Lockett's race-related arguments – can in any way be facially interpreted as having a racial animus.  First of all, the Court notes that Lockett's recollection of the substance of the statement conflicts with Bieber and Arceneaux's version of what was said.  Lockett testified that, after he told Bieber that he was late for a class at SUNO, Bieber responded "You **need** to be at SUNO."  Lockett subjectively interpreted this statement to be a derogatory reference to the fact that SUNO is an historically African-American University, and further extrapolated that this statement was meant to denigrate him as a student of that university.  The Court fails to see how, on its face, even the version of the statement espoused by Lockett can be interpreted as racially charged in any objectively reasonable way.  Furthermore, Bieber and Arceneaux both testified that Bieber did not simply say "You **need** to be at SUNO."  Rather, both men testified that the substance of Bieber's statement was in reference to the fact that Lockett admitted that he was late for class in response to Bieber's initial questions after the stop.  Thus, Bieber and

Arceneaux both testified that the statement at issue was intended to indicate that if Lockett were already at SUNO, as he was supposed to be for his class, he would not have had to speed. Specifically, Bieber testified as follows:

> Q.    Did you give him the full sentence that "if you left
>       your house sooner and done this and did all these other
>       things, you would be there already" or you just simply
>       said "you need to be at SUNO?"
> A.    Yes, sir. I gave him the full statement. The only
>       thing that he's saying is just that I said "you
>       need to be at SUNO" but I think that was [sic]
>       omitted everything what I had said.

Rec. Doc. 51-3, p.14.  Likewise, Arceneaux indicated his similar recollection of Bieber's statement:

> Q.    Was it made? Was the statement "you need to go to
>       SUNO" made?
> A.    A statement to the effect of either"you need to be
>       at SUNO" or "you need to be going to SUNO" was
>       made. I don't recall the exact wording of the
>       phrase, but the meaning of the phrase I remember I
>       took to mean if you were here at SUNO, you wouldn't
>       be late and you wouldn't have been speeding on
>       Hayne.

Rec. Doc. 51-4, p.83.  The Court does not make any determination as to which version of Bieber's statement is the most accurate, and in the end the true version of the statement may never be established.  The Court merely points to the various versions and explanations of that statement to emphasize that *there is no facially apparent racial animus* in any version of the statement on which Lockett bases his claims.

In light of this finding, Lockett's § 1985(3) conspiracy claim fails, as there is no other evidence in the present record

regarding any conspiracy to deprive him of his constitutional rights *based on his race*. While the MP Defendants and Fletcher relied on each other in concluding that Lockett had committed the offenses of speeding, running a red light, and running a stop sign, which might arguably suggest some agreement among them as to the proper charges against Lockett, that agreement was devoid of any racial animus as the record now stands. Furthermore, and as discussed at further length above, Lockett's speculative arguments regarding whether the MP Defendants fabricated traffic violations to justify their actions are insufficient to support any of his claims, and in any event do not indicate any racial animus in and of themselves and in absence of Bieber's disputed statement. In sum, there is no evidence that the MP Defendants and/or Fletcher entered into any understanding or agreement to deprive Lockett of his civil rights *with a racial animus*. As such, the MP Defendants are entitled to dismissal of Lockett's § 1985(3) claims on the present summary judgment record.

As a result, Lockett's § 1986 claims also fail. "In the absence of a claim under section 1985, [plaintiff] obviously cannot sustain a claim under section 1986," which merely provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid ... neglects or refuses so to do." Galloway v.

_State of Louisiana_, 817 F.2d 1154, 1159 n.2 (5th Cir. 1987). Therefore, the MP Defendants and Thomas are also entitled to dismissal of Lockett's claims under § 1986 on the present summary judgment record.

**3)   Supplemental State Law Claims and Immunity Grounds**

As an initial matter, the Court finds, in accordance with the analysis applicable to Lockett's § 1983 excessive force claims, that the MP Defendants are entitled to summary judgment as a matter of law and fact as to Lockett's state law claims of assault and battery.  See _Gerard v. Parish of Jefferson_, 424 So.2d 440, 444 (La. App. 5 Cir. 1982) (" A lawful arrest is a defense to the intentional tort of battery when reasonable force is used to effect such an arrest.") (citing _Kyle v. City of New Orleans_, 353 So.2d 969, 972 (La. 1977).

Likewise, Lockett's state law claims for false arrest, false imprisonment, and malicious abuse of process are subject to summary dismissal based on the same analysis discussed above.  . "Under Louisiana law, the torts of false arrest and malicious prosecution both require malice as an essential element." _Jenkins v. Baldwin_, 801 So.2d 485, 497 (La. App. 4 Cir. 2001) (citing _Morin v. Caire_, 77 F.3d 116 (5 Cir.1996)).  Similarly, the tort of abuse of process requires an "ulterior motive." _Morin_, 77 F.3d at 122.  "Malice may be inferred from a lack of probable cause, or from a finding that the defendant acted

73

recklessly." Id. As discussed in the analysis of Lockett's federal claims, the present record does not support any showing of malice or ulterior motive on the part of the MP Defendants, and thus the MP Defendants are entitled to summary judgment on these claims as well.

The MP Defendants and Thomas additionally argue that they are entitled to immunity on various statutory grounds from the remainder of Lockett's pendent state law claims.[28] The Court will address each in turn.

### a) § 9:2798.1

The MP Defendants and Thomas invoke immunity against Plaintiff's supplemental state law claims under § 9:2798.1, which provides:

> A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.

> B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

---

[28] These include Lockett's claims for loss of reputation, emotional distress, humiliation, embarrassment, pain and suffering, negligence, and claims under Article 2315.6 by Mrs. Lockett.

C. The provisions of Subsection B of this Section are not applicable:

(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

La. Rev. Stat. Ann. § 9:2798.1. In sum, § 9:2798.1 provides immunity to state officials for discretionary acts. Section 9:2798.1 "does not protect against legal fault or negligent conduct at the operational level, but only confers immunity for policy decisions; i.e. decisions based on social, economic, or political concerns." Saine v. City of Scott, 819 So. 2d 496 (La. App. 3 Cir. 2002) (citing Chaney v. Nat. R.R. Passenger Corp., 583 So. 2d 926, 929 (La. App. 1 Cir.1991)). Thus, "[t]he exception protects the government from liability only at the policy making or ministerial level, not at the operational level." Fowler v. Roberts, 556 So. 2d 1, 15 (La.1989). In Fowler v. Roberts, 556 So. 2d 1 (La.1989), the Louisiana Supreme Court concluded that the discretionary acts immunity established by section 9:2798.1 is essentially the same as the discretionary acts exception to the Federal Tort Claims Act. Id. at 15. Consequently, the court adopted the Supreme Court's two-prong Berkovitz test for determining whether the exception applies. Id. Under this test, the court should first determine whether the state employee had an element of choice or whether he violated a

statute, regulation, or policy specifically prescribing a mandatory course of action. If the employee did not have an element of choice, then the immunity does not apply. Id. If the act was discretionary (no mandatory policy was violated), then the court must next determine whether the discretionary act was related to public policy considerations. Id.

The Court finds that § 9:2798.1 immunity does not apply to the MP Defendants in the circumstances of the present case, insofar as their conduct was not related to any policy decision, but rather implicated operational concerns.[29] Additionally, given the dearth of treatment regarding the applicability of § 9:2798.1 to the claims against Thomas, the Court also finds that summary judgment on Thomas's immunity should be denied, as it is unclear whether Thomas is entitled to the immunity as a matter of law. However, as discussed at length below, the remaining claims against Thomas fail as a matter of law, and thus the issue of immunity as to Thomas is moot.[30]

_____

[29] The Court also notes that there is essentially no discussion in the briefing on the present motions beyond a citation to § 9:2797.1 regarding how and whether the immunity provided under that section would apply to the MP Defendants in these circumstances.

[30] The only supplemental state law claims asserted against Thomas are Lockett's claims for intentional infliction of emotional distress, loss of reputation, humiliation, embarrassment, and pain and suffering, as well as Mrs. Lockett's claims for bystander damages under Louisiana Civil Code Article 2315.6. As discussed below, all these claims fail as a matter of law and fact.

### b)  National Guard Immunity under §29:23 and 29:23.1

The MP Defendants cite grounds for immunity to Lockett's

state law claims in the provisions of § 29:23:

> No officer or other member of the military forces of this
> state shall be indicted, prosecuted, or sued for any
> injury to any person or property performed or committed
> by him while in the active service of the state of
> Louisiana in the course of the business of the military
> forces of this state as required of him by this Part.

La. Rev. Stat. Ann. § 29:23.  The parties have not cited, and the

Court has not located, any relevant jurisprudence construing the

scope and applicability of the immunity provided under § 29:23.

Plaintiffs have cited the provisions of § 29:23.1 in

opposition to the MP Defendants' claims of immunity under §

29:23.1.  Specifically, Plaintiffs note the following language in

§ 29.23.1:

> That the intent of this Section is to relieve the state
> and the National Guardsman from liability only where the
> National Guardsman is an employee of the United States of
> America for purposes of respondeat superior liability
> under the Federal Tort Claims Act as provided in 28
> U.S.C. 2671 et seq. This Section is not intended to
> prevent Civil Code Article 2320 or other such laws from
> imposing master-servant liability on the state, or to
> prevent Civil Code Articles 2315 et seq. generally from
> imposing liability in circumstances to which such codal
> articles and/or laws would otherwise impose liability for
> damages caused by the offenses or quasi offenses of
> members of the National Guard committed within the course
> and scope of their National Guard duties when the Federal
> Tort Claims Act does not apply.

La. Rev. Stat. Ann. § 29:23.1(A)(6).  This provision, however, is

part of a section entitled "Nonimposition of liability for acts

of national guardsmen on **duty or training**," and by its own terms

only applies to causes of action arising against national guardsmen engaged in training or duty *pursuant to federal law*, "but not activated to become part of the federal forces as such." Id. at § 29:23.1(A)(1) (emphasis added).  Furthermore, this section only addresses the immunity of the state and individual guardsmen in situations arising under the Federal Tort Claims Act.  Id. at § 29:23.1(A)(6).

It is true that the language of § 29:23.1(A)(6) seems to be in conflict with the blanket immunity afforded active duty guardsmen under § 29:23.  Specifically, the phrase "within the course and scope of their National Guard duties" in § 29:23.1 - which indicates that the immunity from FTCA claims does not extend to state law, non-FTCA claims - appears to conflict with the provision of § 29:23 which immunizes guardsmen from *any* suit arising from his "active service of the state of Louisiana in the course of the business of the military forces of this state." The resolution of this apparent conflict lies in the context of the remaining provisions of  § 29:23.1(A) as well as the history of § 29:23.  As noted earlier, § 29:23.1 applies by its own terms *solely* to causes of action arising during the *training* and *non-active duty* of national guardsmen.  Furthermore, the history of § 29:23 underscores this crucial difference in the scope of each section.  The predecessor statute to § 29:23 was § 29:31, which provided that " [n]o officer or other member of the military

78

forces in this state shall be indicted, prosecuted, or sued for any injury to person or property while performing or attempting to perform any duty required of him by this Part." <u>Marler v. State</u>, 78 So.2d 26, 35 (La. App. 1955). The <u>Marler</u> court held that

> This section absolves members of the National Guard from liability for their acts **when they have been ordered by the Governor into active service** in the event of insurrection, invasion, riot, or imminent danger thereof, or in the event of public disaster or danger from floods, fire, storm or earthquake, or to assist the civil authorities in guarding prisoners. It has no application otherwise to members of the National Guard, such as while on two weeks' training tour

<u>Id</u>. (emphasis added). The <u>Marler</u> court went to cite the Louisiana Supreme Court's holding in <u>State v. Josephson</u>:

> But, manifestly, the statute contemplates two kinds of 'active service'–the 'active service' which follows upon call of the Governor, and the 'active service' which consists in merely being a member of the organization in good standing. The former withdraws the militiamen from the jurisdiction of the civil courts; the latter does not. In fact, the contention that a member of the militia is all the time not amenable to the powers of the courts can hardly be serious.

<u>Id</u>. (citing <u>Josephson</u>, 45 So. 381, 434 (La. 1908)). Thus, given the history of § 29:23, the *absolute* immunity afforded guardsmen *during active duty on behalf of the State* is fundamentally different from the partial immunity and exceptions to that immunity provided in § 29:23.1, which concerns only *non-active* duty and training periods. Besides the fact that history and context support this distinction, this conclusion is also the

only way that the provisions of § 29:23 and § 29:23.1(A)(6) - which are admittedly confusing on their face - can be reconciled.

Based on this analysis, the Court finds that, since the MP Defendants were engaged in active service by order of the Governor of Louisiana,[31] they are entitled to immunity as to all Plaintiffs' state law claims against them in their individual capacities.[32] Furthermore, the Court agrees with the MP Defendants that Plaintiffs' reliance on § 29:23.1 to defeat the MP Defendants' immunity is misplaced. First of all, it is apparently undisputed that the Task Force Gator operations, under which the MP Defendants were deployed to engage in law enforcement in New Orleans, were authorized under Louisiana law pursuant to the Governor's power as commander in chief of Louisiana's national guard. See Rec. Doc. 51-14. As such, the operations of the MP Defendants were clearly active duty operations triggering § 29:23 immunity, not training or non-active duty operations that would implicate the exception to

---

[31] See Rec. Doc. 51-14, Exhibit M, which consists of various Proclamations of the Louisiana Governor's Office extending the state of emergency initially declared after Katrina and continuing the deployment under state law of the Louisiana National Guard.

[32] The Court notes, along with the MP Defendants, that Plaintiffs' state law tort claims against the MP Defendants are brought against them individually, and not against the State. Thus, although the Plaintiffs' claims may have been appropriate as against the State, notwithstanding the MP Defendants' personal immunity under § 29:23, no such claims are before this Court.

immunity provided in § 29:23.1(A)(6).

Furthermore, Plaintiffs' reliance on <u>Giardina v. Lawrence</u>, 2009 WL 1158857 (E.D. La. Apr. 29, 2009), is misplaced. <u>Giardina</u> involved, in part, claims against a national guardsman who shot the plaintiff during an arrest by the NOPD. <u>Id</u>. at * 1. The guardsman defendant initially cited § 29:23 immunity in a motion to dismiss, which the court denied based on (1) the defendant's failure to provide orders indicating that he was in fact a member of the national guard entitled to the immunity at the time of the incident; and (2) the defendant's failure to address the applicability *vel non* of § 29:23.1 in his motion. See <u>Giardina v. Lawrence</u>, Civil Action No. 07-6578, Rec. Doc. 20, p. 2. In response to the guardsman's initial motion to dismiss, the <u>Giardina</u> court "agree[d] that there does not appear to be a lot of jurisprudence on this issue presented here, and [did] not intend to make a finding on its applicability in this matter," thus refusing to "address the merits of any claim or defense based on either section." <u>Id</u>.

After the initial denial of his motion to dismiss on immunity grounds, the guardsman defendant filed a motion for judgment on the pleadings and/or summary judgment on the same § 29:23 grounds. <u>Giardina</u>, 2009 WL 1158857 at *1. The <u>Giardina</u> court noted its previous rejection without prejudice of the guardsman's immunity defense, and pointed out that, despite the

concerns raised in its previous order, the guardsman had still not presented authentic copies of his national guard orders and the parties had still not adequately addressed the interplay between § 29:23 and § 29:23.1. _Id_. at *2. As such, the _Giardina_ court again refused to address the issue of liability and immunity. _Id_. Therefore, the _Giardina_ court never addressed the applicability of or relationship between the two statutory provisions regarding national guard immunity, and the decision does not affect this Court's conclusion.

Finally, this Court has previously commented, although only tangentially, on § 29:23.1. See _Alfonso v. Military Dept._, 2007 WL 4114438, *5 (E.D. La. Nov. 15, 2007). _Alfonso_ involved plaintiffs' personal injury claims _against the State of Louisiana_ arising from a car accident allegedly caused by a mud slick on the roadway resulting from national guard operations after Hurricane Katrina. _Id_. at *1. At issue in this Court's decision was plaintiffs' motion to remand, which the Court ultimately granted. The State, through its Military Department, removed the suit from state court, arguing that "since the allegations contained in [plaintiffs'] complaints occurred during the time when the Louisiana National Guard had been activated pursuant to the Executive Order of the Governor of Louisiana, the Louisiana National Guardsmen were operating in a federal status under 32 U.S.C. 101 et seq., and thus, according to Defendant, a federal

question exists" because plaintiffs' claims were only proper under the FTCA.  Id. at *3.  In addition to this argument in support of its federal question removal, the State also cited § 23:29.1 for the proposition that the statute "was enacted to relieve the state of Louisiana and the National Guardsmen from liability where the National Guardsman is an employee of the United States of America, for purposes of respondeat superior liability."  Id. at *4  In support of their motion to remand, plaintiffs argued that there was no FTCA claim at issue, as they had only sued the *State* and not the United States.  Id. at *4. Without addressing these substantial underlying jurisdictional questions, the Court remanded the case based on the failure of the State *ex rel* the Military Department to join the Department of Transportation and Development in the removal, as well as the untimeliness of the removal petition.  Id. at *7.

Unlike Alfonso, no party has argued in this case that the non-constitutional tort claims against the MP Defendants arise under the FTCA or are anything other than Louisiana tort claims. Stated differently, no party has argued that the MP Defendants were acting in any capacity other than their capacity as active duty guardsmen *of the State of Louisiana*.  Thus, besides the fact that this Court's decision in Alfonso did not even address the applicability of § 9:23.1, the posture of this case is completely different, as there is no question that Plaintiffs' tort claims

arise under Louisiana law and not the FTCA.  Thus, as noted
previously, § 29:23.1 is inapplicable to this case.  Accordingly,
the MP Defendants are entitled to the absolute immunity from suit
provided by § 29:23, as Plaintiffs claims undisputedly arose out
of their actions taken in the active service of the State of
Louisiana in the course of the business of the military forces of
the State.

Based on the finding of immunity under § 29:23, the Court
will not address the MP Defendants arguments under Louisiana
Revised Statutes § 29:735(a)(1).

### 4)  Mrs. Lockett's Claims under Art. 2315.6

Mrs. Lockett asserts claims against the State Defendants of
intentional infliction of emotional distress under Article 2315.6
of the Louisiana Civil Code, which provides a cause of action for
so-called "bystander" emotional damages.  Article 2315.6 allows a
spouse "who view[s] an event causing injury to [her spouse], or
who come[s] upon the scene of the event soon thereafter, [to]
recover damages for mental anguish or emotional distress that
[she] suffer[s] as a result of [her spouse's] injury."  La. Civ.
Code Art. 2315.6(A).  However, the injured spouse "must suffer
such harm that one can reasonably expect a person in the
claimant's position to suffer serious mental anguish or emotional
distress from the experience, and the claimant's mental anguish
or emotional distress must be severe, debilitating, and

foreseeable." Id. at 2315.6(B). The Louisiana Supreme Court has noted that "[a] historical review of cases allowing recovery of bystander damages shows that bystander damages are intended to provide a remedy when severe mental distress arises directly and immediately from the claimant's observing a traumatic injury-causing event to the direct victim." Trahan v. McManus, 728 So.2d 1273, 1279 (La. 1999). The Trahan court further explained that "the Legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances." Id. Thus, the bystander damage inquiry "focus[es] on whether [the bystander claimant] experienced severe and debilitating distress specifically from the **shock caused by the perception of the especially horrendous event**." Id. (emphasis added) (internal quotations omitted).

The Court finds that the facts of this case do not give rise to a cause of action under Article 2315.6 because the injurious event was not sufficiently disturbing such that a person in Mrs. Lockett's position would reasonably suffer severe and debilitating emotional distress. As an initial matter, the Court notes its previous finding that there was no severe *physical*

85

injury to Lockett as a result of the events of this case.  In any event, any alleged injury to Lockett's wrists would not constitute the type of *physical injury* that would reasonably cause Mrs. Lockett severe debilitating emotional distress. Furthermore, there is no allegation, much less any record evidence, that any alleged distress experienced by Mrs. Lockett was severe and debilitating.  Finally, while witnessing her husband's detention and arrest was likely a disturbing experience, the Court finds that it was not sufficiently shocking or horrendous to warrant bystander damages.

The Court finds support for this conclusion in <u>Irvin v. Foti</u>, 1999 WL 504916 (E.D. La. 1999), in which the court denied a mother's claims for bystander damages under Article 2315.6 based on the mother's witnessing of her daughter's arrest, which eventually led to the daughter's death in jail due to complications of diabetes.  <u>Id</u>. at *1.  In denying the claim for bystander damages, the <u>Irvin</u> court held that witnessing an arrest in and of itself cannot give rise to a claim under Article 2315.6:

> The court has no doubt that [plaintiff] has suffered
> greatly because of what happened to her daughter.
> However, witnessing the arrest of a child, while
> traumatic, is simply not the kind of injury contemplated
> by Art. 2315.6. Unlike <u>Lejeune</u>, where the plaintiff came
> upon the scene of a horrific injury to her husband
> immediately after it occurred, the plaintiffs here
> witnessed an upsetting but routine event - an arrest -
> but not the real cause of the injury, which was the
> police department's alleged failure to give [the

86

daughter] her insulin shots and her untimely death as a result.

Id. at *5.  Mrs. Lockett attempts to distinguish Irvin by pointing out the court's suggestion that if the plaintiff mother had known contemporaneously with the arrest that her daughter would die, then she might have a claim under Article 2315.6.  Based on this statement in Irvin, Mrs. Lockett argues that she was contemporaneously aware of her husband's handcuffing, the racial discrimination to which he was subjected, and the embarrassment and anxiety he endured.  This argument misses the crux of the Article 2315.6 analysis - which the Louisiana Supreme Court has described as "whether [the bystander claimant] experienced severe and debilitating distress specifically from the **shock caused by the perception of the especially horrendous event**."  Trahan, 728 So. 2d at 1279.  As noted earlier by this Court, and as confirmed by the decision in Irvin, "witnessing an arrest of a [relative], while traumatic, is simply not the kind of injury contemplated by Article 2315.6."  While the Irvin court went on to elaborate on this statement relevant to the specific facts of that case, the statement is also true in this case.  As such, the State Defendants' motion for summary judgment as to Mrs. Lockett's claims under Article 2315.6 should be granted.

The Court also notes that Lockett has himself asserted claims for intentional infliction of emotional distress under

Louisiana law.  In order to recover for intentional infliction of emotional distress under Louisiana law, a plaintiff must demonstrate (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.  White v. Monsanto Company, 585 So.2d 1205, 1209 (La.1991).  "Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous."  Nicholas v. Allstate Ins. Co., 765 So.2d 1017, 1025 (La. 2000).  Based on the Court's previous extensive analysis of Lockett's various claims in this case, there is no evidence in the present record to indicate that the conduct of the State Defendants was "extreme and outrageous" or that any of the State Defendants "desired to inflict emotional distress" or knew that such distress would occur in the circumstances.  As such, Lockett's claims for intentional infliction of emotional distress also fail as a matter of law and fact, and should be dismissed.  Likewise, for the same reasons discussed at length in this opinion, Lockett's claims for  loss of reputation, humiliation, embarrassment, and pain and suffering should be dismissed as a matter of law.

For these reasons, all Plaintiffs' claims against the State Defendants fail as a matter of law on the present summary

judgment record.  Accordingly,

**IT IS ORDERED** that the State Defendants' **Motion to Dismiss Pursuant to FRCP 12(b)(1) (Rec. Doc. 47)** as to Plaintiff's claims asserted against them in their official capacities is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the State Defendants' **Motion for Summary Judgment (Rec. Doc. 48)** as to Plaintiff's federal and state law claims asserted against them in their individual capacities is likewise **GRANTED.**

**IT IS FURTHER ORDERED** that all Plaintiff's claims against the State Defendants' in their official capacities are hereby **DISMISSED WITHOUT PREJUDICE** under the Eleventh Amendment**,** with the exception of Plaintiffs' claims for prospective injunctive relief against Governor Jindal, which are **DISMISSED WITH PREJUDICE** under City of Los Angeles v. Lyons.

**IT IS FURTHER ORDERED** that all Plaintiff's claims against the State Defendants' in their individual capacities are hereby **DISMISSED WITH PREJUDICE** in light of the above rulings.

New Orleans, Louisiana, this <u>26th</u> day of <u>  June  </u>, 2009.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE